SINKA v. McKINNON.

1. APPEAL AND ERROR—CHANCERY CASES HEARD DE NOVO.
   On appeal the Supreme Court considers a chancery case *de novo*.
2. EQUITY—MISTAKE OF LAW.
   Mistake of law is not usually a ground for equitable relief in Michigan.
3. SAME—MISTAKE OF LAW—REFORMATION OF INSTRUMENTS—RESCISSION.
   Parties with knowledge of the facts, and without any inequitable incidents, who have made an agreement or an instrument as they intended it should be, and the writing expresses the transaction as it was understood and designed to be made, will not, in a court of equity, be allowed a defense or granted reformation or rescission although one of the parties may have mistaken or misconceived its legal meaning, scope, or effect.
4. MISTAKE—LEGAL EFFECT—EQUITABLE RELIEF.
   Mistake as to the legal effect of a written instrument, deliberately executed and adopted, constitutes no ground for relief in equity.

Failure of purpose through mistake of law, see Restatement, Restitution, § 48.
Mistake of legal effect of grant, see Restatement, Restitution, § 51.

5. Equity—Contracts—Mistake of Law.

Where the mistake is not in the contract itself but the terms used in or omitted from the instrument which give it a legal effect not intended by the parties and different from the contract actually made, equity will always grant relief unless barred on some other ground, by correcting the mistake so as to produce a conformity of the instrument to the agreement, but, where the mistake of law is as to the legal effect of the contract actually made, the contract will not be relieved against unless there are other equitable legal features calling for the interposition of the court.

6. Deeds—Fraud—Undue Influence—Intent.

Transaction whereby childless couple, owning property jointly, transferred it to a third person who reconveyed it to the wife, each deed being without money consideration, which was not accompanied by fraud or undue influence upon part of wife, will not be set aside in husband's suit after death of wife some eight years later, where record does not show inequitable conduct on part of wife or her mother, the wife's other heir and a resident of Hungary, to secure an unconscionable advantage of plaintiff, and it appears as reasonable to presume plaintiff and his wife intended to place the property in her name alone as it is to presume that they intended plaintiff would become the sole owner upon his wife's death, there being insufficient basis to warrant the interposition of a court of equity (Act No. 288, chap. 2, § 80, Pub. Acts 1939).

Appeal from Wayne; Webster (Clyde I.), J. Submitted April 8, 1942. (Docket No. 37, Calendar No. 41,937.) Decided May 18, 1942.

Bill by Kalman Sinka against Frank McKinnon, administrator of the estate of Julia K. Sinka, deceased, and Julia Bodi to set aside deeds to real estate. Decree for plaintiff. Defendants appeal. Reversed.

*Belanger, Wood, Jacquemain & Werner,* for plaintiff.

*Robert O. Brown,* for defendant administrator.

*Fred A. Lehmann,* for defendant Bodi.

STARR, J.   Plaintiff and his wife, Julia K. Sinka, emigrated from Hungary many years ago and settled in Detroit.   They had no children.   In about 1922 they purchased a lot on Gray avenue, Detroit, title being taken in their joint names.   In about 1924 they built a two-family house on such lot. They did not occupy such two-family house, but lived in an apartment building where plaintiff owned and conducted a tailor shop.

Plaintiff became ill in the summer of 1931 and on August 17th of that year he and his wife executed deed of the two-family house on Gray avenue to one Joe Bacha (now deceased).   The next day Bacha executed deed of the property to plaintiff's wife, Julia K. Sinka, individually.   There was no money consideration for such deeds.   Title remained in the wife individually for over eight years and until January, 1940, when she died intestate.   Under the Michigan laws of descent and distribution (Act No. 288, chap. 2, § 80, Pub. Acts 1939 (Comp. Laws Supp. 1940, § 16289–2[80], Stat. Ann. 1941 Cum. Supp. § 27.3178[150]), her real estate would descend one-half to her husband (plaintiff) and one-half to her mother, defendant Bodi, who resides in Hungary.

On September 30, 1940, defendant McKinnon was appointed administrator of plaintiff's deceased wife's estate.   The wife's estate consisted of the two-family house and a claim against the receiver of the First National Bank of Detroit for an impounded deposit of $502.65.   There is testimony indicating that plaintiff filed a claim against the wife's estate, which claim was later withdrawn.   The record does not indicate the nature of such claim.

On November 23, 1940, plaintiff filed bill of com-

plaint against his deceased wife's mother, defendant Bodi, and Frank McKinnon, as administrator of the wife's estate. In his bill of complaint plaintiff alleged, among other things, that in 1931 he became ill; that his wife became alarmed as to her security in case of his death and consulted a friend who erroneously advised her "that she would not be protected in the event of her husband's death unless the property was solely in her own name;" that the jointly-owned property was accordingly deeded to his wife; and that after his wife's death he consulted an attorney who advised him that the property would descend one-half to himself and one-half to his wife's mother, defendant Bodi. Plaintiff further alleged that the transfer of the jointly-owned property to his wife individually "constituted a mistake due to ignorance, and misadvice, and was done without the knowledge of the parties as to their rights * * * or the result of their actions, and was made without consideration * * * and constituted a mistake of fact." Plaintiff asked that the deed of August 17, 1931, from himself and wife to Joe Bacha, and the deed of August 18, 1931, from Bacha to the wife individually, be declared null and void and that plaintiff be decreed to be the sole owner of the property. Defendants filed separate answers generally denying plaintiff's right to the relief sought.

The case was referred to a circuit court commissioner, who took testimony. The commissioner's report to the circuit court, filed October 7, 1941, made a finding that as a matter of law the two deeds in question "were executed under a mistake of law" and should be set aside and cancelled. The circuit judge stated in his opinion:

"I do think there was sufficient testimony to es-

tablish clearly what the intent of both the deceased and the plaintiff was, and to establish the fact that there was a mistake of law on the part of both of them. The cases seem to be quite clear that a court of equity will not ordinarily find a mistake of law as a ground for equitable relief. * * * There must be something besides the mistake of law, either fraud or misrepresentations, or it must clearly appear if there is no fraud or misrepresentation in the case, that the mistake at law results in an injustice. I think the facts in this case come within this last branch of the doctrine. I think it would be a clear injustice to permit these deeds to stand. * * *

"I am satisfied from the testimony that solely because of the mistaken idea that if he died his relatives would get part of this property and she would get the other part, that they both deeded the property to a third party and had the third party deed it back to her. I do not believe that she intended or he intended at any time that this property or half of it should go to her mother in Hungary. That is not the way people come over here. That would be contrary to all human experiences. Hundreds of thousands of people come from the old country and by hard work and saving accumulate a little house and lot over here but it would be unheard of and unthinkable, almost, that either of them, when they died, would want that little house to go half to the survivor and half to the father or mother in the old country. I am satisfied, I say, that the intent of both of them was that if he died, this property was to go to her, not half to her and half to his father or mother, and that if she died, it was to go to him and not half to him and half to her mother. Then they go ahead and do the very thing that absolutely destroys what I am satisfied they both wanted to do. * * *

"He signed the deed to the third party because his wife had got it into her head through somebody,

neighbor people, I suppose, that the only way she could protect herself and keep this property when he died was to have the title put in her name. I am satisfied that she convinced him that that was the situation and that that was the way he wanted it to be. He wanted it to go to her after he died. They did not, evidently, discuss what would happen if she died first, but as I say, I am satisfied that they both would want the property to go to him if she did die first.

"I think when a court of equity has this kind of testimony before it that that comes within the cases. While these deeds cannot be set aside solely because these people had a mistaken idea as to the law, they can be set aside when the court is satisfied it would be inequitable and unjust to have them stand. Decree may therefore be entered in favor of the plaintiff and setting aside these deeds."

Decree was entered December 15, 1941, declaring the two deeds in question null and void "as given by mistake of fact," and determining plaintiff to be the sole owner of the two-family house. Defendants appeal from such decree and contend that there was no mistake of fact or law justifying the decree and that the two deeds in question did not result in an injustice or inequity to plaintiff. This being a chancery case, we consider the same *de novo*.

Plaintiff's contention that there was a *mistake of law* can only be based upon the assumption that plaintiff and his wife erroneously understood and believed that, by placing the title in the wife's name alone, such title would descend to the survivor of them.

In considering the question as to whether or not plaintiff and his wife, in placing title to the property in the wife's name, were laboring under a mistaken understanding of the law, it is necessary to examine closely the somewhat confusing testimony. Plain-

tiff and many of his witnesses were Hungarians and apparently had difficulty in expressing themselves in the English language.

There was testimony that plaintiff had repeatedly sent money to his wife's mother (defendant Bodi) and had also sent money to other relatives in Hungary; that he had bought and now owns two houses in Hungary, one for his mother and one for his wife's mother "to live on (in) free of charge." Plaintiff further testified, in part:

"*Q.* And that you were out to his place (witness Kulcsar's) on West Jefferson avenue about eight months ago and you told him that you had transferred this property on Gray avenue to your wife because you were a co-signer on a note—is that right?

"*A.* That's right. Told him that one, too. * * *

"*Q.* Well, this property that you deeded over to your wife belonged to both of you, didn't it?

"*A.* It was belongs to both.

"*Q.* And it was by both of your efforts that that property was obtained?

"*A.* We make it right in the United States, that money. * *

"*Q.* Do you remember what you told him (Mr. Lehmann)?

"*A.* I told him exactly. I was sick and she never was in the business and she was scared, afraid if I die my relations want to take away the property from off her hand because she never was in the business. She never was in the court. She was a good wife, and nothing for the business. She don't handle that. That was protect for herself."

The real-estate agent who prepared the two deeds in question testified, in part:

"*Q.* Do you remember who it was that came to see you, Mr. or Mrs. Sinka?

"*A.* Both Mr. and Mrs. Sinka. * * *

"*Q*. Did she say for what purpose she wanted a deed drawn?

"*A*. There was,—she said she was afraid that if her husband passed away she might not have the property. She would not,—not exactly in those words. It was something like that. She was afraid that the ones in Europe might get possession of it, and she would have to go through trouble to get it. In other words, she wanted it all in her name. * * *

"*Q*. Did she say to you that she wanted it all in her own name?

"*A*. "Yes."

Another witness for plaintiff testified, in part:

"*Q*. What did she (plaintiff's wife) say?

"*A*. She said that in case she was afraid that maybe he die and his relative, his relatives in Europe claim the property here, she want to safeguard herself an interest to transfer the title over to her name. * * *

"*Q*. Did she give any other reason for the transfer, outside of his sickness?

"*A*. The only reason that she gave to me that she was afraid that the property would go to his relatives, and in the possibility that he died, she would be left here without money. * * *

"*Q*. She was afraid that her mother would not get any of the property?

"*A*. She was afraid that his relatives will claim the property."

Another witness for plaintiff testified, in part:

"*Q*. What did she (plaintiff's wife) tell you?

"*A*. Well, she said that it was in both names, and she would like to have it signed to her in case that he dies, so that she would be protected, so that his relatives would not claim anything, because they didn't have any children."

Another witness testified:

"*Q.* What did she tell you about the property?

"*A.* Well, what I know, I didn't know all about it. What property exactly they had. I know that they were quite well off as Hungarians. * * *

"She was kind of—you know, afraid or crying, what is going to happen to her if he was going to die. It wasn't down in her name. She was crying, and asked us to talk to Kalman (plaintiff) to put things in her name, so that she could live comfortably if something happens to him. * * *

"*Q.* What did Mrs. Sinka say to you about the property?

"*A.* Well, they were talking about when he was so sick, and she was kind of scared like. She couldn't talk English. She didn't know no trade to go out to work. She said in case that he dies the property will be,—she didn't know. She didn't know what she was going to do."

The attorney for the Hungarian consul general interviewed plaintiff in his tailor shop. He testified, in part:

"*A.* Well, the inquiry (from the Hungarian consul general) came on account of the mother of Mrs. Sinka, who lived in Hungary. So I went over to the probate office here first, which is my custom, to see if there was any record here of an estate, and I found there was no record of any estate being probated here. So I then went to see Mr. Sinka himself, 1118 Gray avenue. I found him there and talked with him in his tailor shop. He told me he was in the tailor business and at that time he told me about the property—that it was the Gray avenue property, 1666 and 1668 Gray avenue. That property was in his wife's name, and he told me that he had it so placed for his personal protection. That is, he told me they wanted to avoid any claim of creditors because he was, as I remember, he and

his wife were in the tailor business.    *    *    *

"*Q.*    *    *    *    All right, witness.    Just tell the court what Mr. Sinka told you about this property on Gray avenue, 1666.

"*A.*    He told me that that property was in his wife's name alone; that it was so placed for their personal protection; that he was in the tailor business and he wanted to avoid any possible claim of creditors.    *    *    *

"*Q.*    *    *    *.    He said nothing about having been sick to you?

"*A.*    No, never.    Never one word about being sick.    The whole idea was that he wanted to avoid creditors.    *.    *    *

"The place was worth about $6,000."

There was other testimony indicating that plaintiff may have placed the property in his wife's name alone to protect it from his liability as signer of a note.    Plaintiff denied that he had any creditors and denied that he placed the property in his wife's name as a protection against creditors.

The question is: Does the testimony establish such mistake of fact or law and such inequitable injustice to plaintiff as would authorize a court of equity to declare the deeds in question null and void?

The rule that a *mistake of law* is not usually a ground for equitable relief is well established in this State.    In the case of *Renard* v. *Clink,* 91 Mich. 1, 3 (30 Am. St. Rep. 458), Mr. Justice Montgomery stated the following rule, which has been generally recognized in later decisions:

"Where parties, with knowledge of the facts, and without any inequitable incidents, have made an agreement or other instrument as they intended it should be, and the writing expresses the transaction as it was understood and designed to be made,

equity will not allow a defense, or grant a reformation or rescission, although one of the parties may have *mistaken or misconceived its legal meaning, scope, or effect. Martin* v. *Hamlin,* 18 Mich. 354 (100 Am. Dec. 181); *Lapp* v. *Lapp,* 43 Mich. 287.''

In *Crane* v. *Smith,* 243 Mich. 447, 450, Mr. Justice FEAD said:

''The deed was drafted by plaintiffs' attorney, upon full knowledge of the facts and claims. There was no showing that he made a mistake in stating its agreed terms. The mistake, if any, was purely one of law, 'an erroneous conclusion as to the legal effect of known facts.' 40 C. J. p. 1228. Mistake as to the legal effect of a written instrument, deliberately executed and adopted, constitutes no ground for relief in equity.''

See, also, *Barr* v. *Payne,* 298 Mich. 85; *Walter* v. *Walter,* 297 Mich. 26; *Holmes* v. *Hall,* 8 Mich. 66 (77 Am. Dec. 444); 6 R. C. L. p. 628.

In 10 R. C. L. p. 315, it is stated:

''There are two well-defined classes of mistakes of law in contracts: first, a mistake in law as to the legal effect of the contract actually made; and, second, a mistake in law in reducing to writing the contract, whereby it does not carry out or effectuate the intention of the parties. In the former, * * * *the contract actually entered into will seldom, if ever, be relieved against unless there are other equitable legal features calling for the interposition of the court;* but in the second class, where the mistake is not in the contract itself, but terms are used in or omitted from the instrument which give it a legal effect not intended by the parties, and different from the contract actually made, equity will always grant relief unless barred on some other ground, by correcting the mistake so as to produce a conformity of the instrument to the agreement.''

In the present case neither plaintiff's wife nor her mother, defendant Bodi, are charged with misrepresentation, deceit, or undue influence to induce plaintiff to execute the deed by which his wife acquired title. The record does not show inequitable conduct by plaintiff's wife or her mother whereby they sought to secure an unconscionable advantage of plaintiff.

For many years plaintiff and his wife had contributed to the support of his wife's mother in Hungary, and it is not unreasonable to assume that they intended to protect the wife's mother by placing the property in the wife's name alone. It is as reasonable to presume that plaintiff and his wife intended to place the property in her name alone as it is to presume that they intended the result claimed by plaintiff. Plaintiff's wife is deceased and cannot answer the alleged mistakes of fact and law. In view of the somewhat confusing testimony, we hesitate to undo the transactions by which the wife acquired title to the property.

We do not overlook the fact that, apparently without objection by plaintiff, the title to the property stood in the name of his wife alone for over eight years prior to her death. The testimony reasonably indicates that the wife desired to hold title so that she and her mother would be protected in case of plaintiff's death and so that plaintiff's relatives in Hungary would not inherit the property.

That plaintiff and his wife may have been mistaken as to the legal result of placing the property in the wife's name alone does not warrant the interposition of a court of equity.

We conclude that there was no mistake of fact or law justifying the decreeing of the two deeds in question to be null and void. The testimony is not convincing that the placing of title to the property

in the wife's name resulted inequitably or as an injustice to plaintiff.

The decree of the circuit court entered December 15, 1941, is hereby set aside and a decree shall be entered dismissing plaintiff's bill of complaint. Defendants shall recover costs.

CHANDLER, C. J., and BOYLES, NORTH, WIEST, BUTZEL, BUSHNELL, and SHARPE, JJ., concurred.