Josephine HOFFA, Plaintiff,

v.

Frank E. FITZSIMMONS et al., Defendants.

Civ. A. No. 76–0566.

United States District Court, District of Columbia.

Oct. 3, 1980.

Robert D. Grossman, Jr., Michael E. Tigar, Washington, D. C., for plaintiff.

Barry Levine, M. J. Mintz, Washington, D. C., for defendants.

## MEMORANDUM ORDER

HAROLD H. GREENE, District Judge.

This case is centered on the events surrounding the retirement of James R. Hoffa as general president of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Teamsters) in 1971, at a time when he was serving a federal prison sentence for jury tampering. Pending before the Court are the parties'[1] cross–motions for summary judgment.

I

On June 19, 1971, after his conviction in federal court, Hoffa resigned his office at the age of 58 after over thirty years of service with the Teamsters. Among the factors which appear to have been responsible for this decision were pressure from the Executive Board of the Teamsters[2] for a decision on whether he would seek reelection notwithstanding the service of his sentence;[3] his wish to take advantage of a lump sum benefit payment from his pension fund in lieu of a deferred annuity; and the probability that his withdrawal from union activities might improve his chances for an early release from confinement.

Apparently with these factors in mind, Hoffa and his personal attorney began negotiations with the trustee and the administrators of the Retirement and Family Protection Plan for Officers and Employees of the Teamsters (the Plan),[4] an employer–maintained pension plan. These discussions were designed to arrive at an agreed–to sum which would reflect Hoffa's rights to a lump sum payment under the Plan.

Under the terms of the Plan, a member may qualify for retirement income without reduction in the amount in the accrued annuity balance either by attaining the normal retirement data or by fulfilling the conditions of the so–called twenty–year service retirement benefit. The Plan further provided that upon fulfillment of various conditions a member could draw a cash benefit in lieu of retirement income,[5] and Hoffa decided to exercise that option.

1. Hoffa disappeared on or about July 30, 1975, and is presently listed as a missing person. His wife, Josephine Hoffa, was appointed to serve as administratrix of his estate. Although she died during the pendency of this litigation, to be presumably succeeded by another administrator, she is listed as plaintiff herein.

2. The union itself was being administered by its then vice president, Frank Fitzsimmons.

3. See *Hoffa v. Saxbe*, 378 F.Supp. 1221, 1223 (D.D.C.1974). Hoffa's prison term was due to expire on March 6, 1980, with a mandatory release date of November 28, 1975, but he was, of course, eligible for parole prior to that time.

4. Frank Fitzsimmons is chairman and representative of the Administrative Committee of the Plan, and Ray Schoessling is the present trustee. Both are listed herein as defendants acting in their official capacities. Claims against Fitzsimmons acting in his individual capacity were dismissed by plaintiff.

5. This option was available to any member who had (1) commenced service with the Teamsters prior to January 1970, and (2) fulfilled the conditions of the twenty–year service requirement. At the time of his retirement, Hoffa met these criteria.

To that end, Hoffa and the Plan executed an Agreement for Deposit (Agreement), which dealt with the lump sum payment to Hoffa and which also provided for escrow obligations on the part of Hoffa to satisfy certain Internal Revenue obligations. These obligations, established by the Internal Revenue Code, 26 U.S.C. § 401(a), and Treasury Regulations § 1.401–4(a)(1) and (c)(1),[6] are designed to insure that the integrity of pension plans will not be threatened by a discriminatory payment to union officials at the expense of rank–and–file members. To that end, they impose restrictions on the immediate payment of lump sum termination benefits when the recipient is an officer or one of the twenty–five highest paid employees of a union.

The Agreement provided that these government regulations would be complied with through an escrow arrangement.[7] Under this arrangement, the restricted amounts, as determined by the Plan, were paid to Hoffa on condition that he deposit them with a third–party depositary bank,[8] to be held as security for any obligations he might incur if the integrity of the Plan were in jeopardy. The Plan expressly warranted that the lump sum represented the amount to which Hoffa was entitled under the pension terms.

Prior to the execution of the Agreement, the Plan's Administrative Committee had designated an actuary to whom the Committee delegated the responsibility for calculating Hoffa's actuarial reserve balance. The actuary determined that this balance amounted to $1,745,141.21.[9] On that basis this amount was included in the Agreement as the sum to which Hoffa was entitled as his lump sum cash termination benefit. As part of the same computation, the Plan concluded that, in order to comply with the applicable regulations regarding monetary restrictions on the part of the lump sum benefit, it would be necessary to restrict $650,070.31 of the lump sum, and that the regulations would further be effectuated by a two–time, staggered release of the escrowed accounts, with Hoffa receiving the entire restricted amount over the course of four and one–half years. Hoffa agreed.

By its own terms, the Agreement was fully integrated, and it specifically provided that the rights and duties of the parties were established as of June 19, 1971. Since Hoffa was unable personally to be present at the June 24, 1971 closing, his son represented him and received a check from the Plan for the full $1,745,141.21. In accordance with the security and escrow provisions of the Agreement, he immediately deposited the restricted amount ($650,-070.31) in the depositary bank. On July 1, 1974, the Plan, through its trustees and its Administrative Committee, determined that the lump sum tendered to Hoffa in June of 1971 conformed with the requirements of the applicable regulations, and it authorized

---

**6.** Article XII of the Plan incorporates similar provisions.

**7.** Paragraph 11 of the Agreement sets up the escrow as the means for requiring Hoffa to repay the Plan, ". . . if and as may be required to give effect to the principles of said Article XII of the Plan and said Internal Revenue Service Regulation Section 1.401–4(c)." Paragraph 12 states that the Plan will deliver to the bank on the specified escrow release dates a certification that Hoffa was not liable for any repayment under paragraph 11.

**8.** The American Security and Trust Company, a District of Columbia banking institution, was selected and agreed to serve as the depositary for the restricted funds. It was originally named as a party defendant, but was dismissed as a party in plaintiff's amended complaint and pursuant to an order of this Court dated May 8,

1978. The funds in question are being held at interest subject to the outcome of this litigation. The parties have stipulated that an order to turn over the amount of the restricted funds still on deposit would be appropriate without a finding of the need for specific performance.

**9.** From 1961 through 1969, the Trustee of the Plan provided Hoffa with an annual statement of the total actuarial reserve credited to his retirement account. Based in part on these representations, plaintiff found the 1971 amount warranted by the Plan to be "reasonable and appropriate." Plaintiff's attorney has stated that he was informed of the 1971 amount by the actuary for the Plan, and he never questioned the accuracy of that amount because he had been informed of annual increases since 1961.

the bank to release the first restricted amount ($188,934.14 plus interest). The bank thereupon released the appropriate funds.

The second escrow account in the amount of $461,136.31 was due to be released on January 1, 1976. Two weeks prior to that date, the Plan's Administrative Committee instructed the bank not to release the remaining funds,[10] and thereafter, just prior to the date called for in the Agreement for the release of the funds in the remaining escrow account, plaintiff made a demand on the Plan for such release. The Plan refused, and this action followed.

The complaint asserts three claims.[11] The first count seeks specific performance of the provision in the Agreement which requires the Plan, through its Administrative Committee and the trustees, to release the remaining escrow funds (plus interest). The third count, which is closely related to the first, seeks damages for the alleged breach of express warranties made to plaintiff by the Plan in the Agreement. The fourth count is not based on the Agreement, but claims that an improper calculation was made in the computation of the case termination benefit. Defendants have filed a counterclaim in which they seek return of an amount by which Hoffa was allegedly overpaid,[12] and plaintiff has responded to the counterclaim with various defenses. Plaintiff seeks summary judgment on the third count of her complaint;

defendants request summary judgment in their favor on the first, third, and fourth counts of the complaint and on the counterclaim.

## II

Defendants have raised a host of issues [13] in their answer and their counterclaim,[14] but the basic thrust of their argument, though asserted with many different variations is relatively simple. The amount of the lump sum payment, it is argued, was incorrectly calculated when the Agreement was drawn and, for a variety of reasons, Hoffa should not now receive the benefit of that mistake. The response is equally simple: the pertinent calculations were made by an agent of defendants; when defendants entered into the Agreement, they warranted the accuracy of these calculations; and if there are to be any losses,[15] they are defendants' responsibility, not Hoffa's.

While, as noted, defendants assert a great many defenses, only a limited number merit extended discussion: (1) that they are excused from performance of the Agreement on account of mistake made in good faith; (2) that the Agreement is void as against public policy; (3) that the Agreement violates the Employment Retirement and Security Act of 1974 (ERISA); and (4) that the Agreement is not supported by valid consideration and is therefore unenforceable. These will be considered *seriatim.*

10. No determination was made that the original lump sum benefit payment was inconsistent with the applicable regulations regarding the integrity of the Plan.

11. Plaintiff filed her original complaint on April 8, 1976, seeking specific performance of the Agreement to obtain the release of the remaining escrow account plus accumulated interest. She was granted leave to file an amended complaint on August 24, 1976, and a second amended complaint on November 29, 1976. Count II of the second amended complaint sought damages for misrepresentation of fact and law, but plaintiff voluntarily dismissed that count on October 16, 1979.

12. According to defendants, the correct amount payable to Hoffa under the Plan is $1,109,-733.91 rather than $1,745,141.21.

13. These include failure to state a claim for which relief may be granted; failure to join an indispensable party (the Internal Revenue Service); accord and satisfaction; violation by Hoffa of his fiduciary obligations; mutual mistake in the formulation of the Agreement; statute of limitations; lack of consideration or mutual obligation on the part of Hoffa; illegality; and that the warranties made by the parties were not to be applied beyond the date for the closing of the Agreement.

14. The arguments advanced in support of the defenses and the counterclaims overlap substantively to a certain extent, and they will therefore be treated together.

15. Plaintiff does not acknowledge that the calculations were in error. See Part V, *infra.*

## III

Defendant's reliance on the defense of good faith mistake does not avail them for several reasons.

 In the first place, there is no evidence that Hoffa actively participated in any way in the mistake. If there was a mistake, it was that of the actuary of the Plan who was delegated the authority to make the requisite calculations by defendants, not by Hoffa.[16] It is they, therefore, who must bear the burdens of the actuary's mistake, if any. *Fidelity Deposit Co. of Maryland v. McQuade*, 123 F.2d 337 (D.C. Cir.1941). A contract will be cancelled or modified only if the mistake is mutual or otherwise attributable to both parties. *Schwaderer v. Huron–Clinton Metropolitan Authority*, 329 Mich. 258, 45 N.W.2d 279 (1951); *Teeter v. Teeter*, 332 Mich. 1, 50 N.W.2d 716 (1952).[17]

Even if both parties were under a misapprehension as to the correctness of the calculation, the mistake would still not be regarded as mutual where, as in this case, one party was the source of the other's knowledge of the relevant facts. *Trans–State Investments, Inc. v. Deive*, 262 A.2d 119 (D.C.App.1970); *WKBW, Inc. v. Children's Bible Hour*, 332 Mich. 569, 52 N.W.2d 219 (1952). That principle is especially relevant here where one party (Hoffa) as a practical matter lacked the capacity to challenge the assertions of the other.

 Finally, and perhaps most importantly, defendants warranted[18] that the Agreement constituted a binding and enforceable contract of the Administrative Committee and of the Trustees "entered into in accordance with the Plan and in accordance with the Committee's own rules and regulations," and further that, unless a determination was made that the lump sum payment was violative of the applicable Treasury Regulations, they would release the escrow account at the times called for in the Agreement. These warranties bound defendants irrespective of mistake. See *Detroit Trust Co. v. Struggles*, 289 Mich. 595, 286 N.W. 844 (1939). As Judge Learned Hand succinctly observed,[19] at common law

> A warranty is an assurance by one party to a contract of the existence of a fact upon which the other party may rely. It is intended precisely to relieve the promisee of any duty to ascertain the fact for himself; it amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue, for obviously the promisor cannot control what is already in the past. To argue that the promisee is responsible for failing independently to confirm it, is utterly to misconceive its office.

By including in the Agreement a warranty of certain facts, defendants bargained that they would bear the loss in the event it turned out that these facts were otherwise than as represented. *Corbin on Contracts*, § 598, p. 591 (1960 ed.); *Gulf Oil Corp. v. Federal Power Commission*, 563 F.2d 588 (3d Cir. 1977) (express warranty of delivery binding against claims of mistake and commercial impracticability).[20] On this basis, plaintiff would appear clearly to be entitled

---

**16.** Defendants are entitled to a reformation or rescission of the contract only if they establish mutuality of mistake by clear and convincing evidence. *Blue Water Excavating Co. v. State*, 4 Mich.App. 266, 144 N.W.2d 630 (1966). No such evidence has been adduced, and the Court finds that there is no genuine issue of material fact on that issue.

**17.** A mistake as to the legal effect of a written instrument is not grounds for the intervention of equity to void a party's rights under contract in any case. See *Sinka v. McKinnon*, 301 Mich. 617, 4 N.W.2d 32 (1942).

**18.** Both parties also warranted that they had the legal capacity to contract.

**19.** *Metropolitan Coal Co. v. Howard*, 155 F.2d 780, 784 (2d Cir. 1946) (citations omitted).

**20.** These conclusions also dispose of defendants' claim that Hoffa would be unjustly enriched if he were successful in this litigation. Such a claim cannot overcome the validity of a bargained for, enforceable, legal contract, not induced by fraud, misrepresentation, or mistake attributable to plaintiff. See *Michigan Medical Service v. Sharpe*, 339 Mich. 574, 64 N.W.2d 713 (1954).

to judgment on the third count of his complaint.

### IV

■ Defendants argue, however, that, to the extent that the Agreement requires that a further payment is to be made to Hoffa, it is void as against public policy.

The Agreement explicitly states that the parties had the necessary legal capacity to enter into a binding contract, and that the provisions creating the escrow accounts and restricting a portion of the lump sum benefit were included to effect compliance with both the IRS regulations and the Plan's own articles. Thus, it clearly was not entered into for an illegal purpose,[21] but was, on the contrary, designed to assure compliance with federal governmental requirements and the rules of an international labor organization pension plan.

Defendants' illegality and public policy arguments to the contrary rest on the proposition that under the Agreement Hoffa would be paid a benefit greater than that permitted by the terms of the Plan. More specifically, the contention is that the Agreement contravenes the terms and conditions of section 501 of the Labor–Management Reporting and Disclosure Act, 29 U.S.C. § 501, as well as common law fiduciary obligations of union representatives, and that a judgment for plaintiff would work a violation of defendants' fiduciary duties under section 501.

That argument misconceives the relative duties and obligations of the parties. The issue before the Court in this lawsuit is not whether the defendants breached their fiduciary duties to their pension plan or its members, but whether these defendants bound themselves to an enforceable contract with plaintiff. If defendants did indeed violate their fiduciary duties, they may well have a legal problem vis–a–vis the Teamsters or the members of the Plan, and any judgment rendered here on the validity of the Agreement will not insulate them from liability in that respect, whether under section 501 or on some other basis. But their violation in that regard, if any,[22] will not defeat the effort of an innocent party[23] to enforce a good faith written contract[24] containing safeguards designed to insure compliance with federal laws and regulations.[25]

### V

Consideration of the Employment Retirement Security Act of 1974, 29 U.S.C. § 1001 et seq. (ERISA) in conjunction with defendants' public policy arguments likewise fails to assist their case.

**21.** Under the law of Michigan, a contract for an illegal purpose is void (*Silver v. A.O.C. Corp.*, 31 Mich.App. 147, 187 N.W.2d 532 (1971)), but only where performance of that contract would cause a violation of a statute which has to do with public health, morals, and safety. *Grosslight v. Butts*, 3 Mich.App. 51, 141 N.W.2d 657 (1966). There is a presumption that contracts are legal unless demonstrated to be otherwise. *Alpine Construction Co. v. Gilliland*, 23 Mich. App. 275, 178 N.W.2d 530 (1970).

**22.** It is questionable that there was a breach. *Oates v. Teamster Affiliates Pension Plan*, 482 F.Supp. 481 (D.D.C.1979). Defendants state (Memorandum in Opposition, p. 13, note 11) that neither they nor their predecessors violated any of their fiduciary duties by "mistakenly" paying Hoffa any "excess" lump sum. It is hard to fathom how defendants can, on the one hand, claim that there was no fiduciary violation, while relying, on the other, on just such a violation to attack the legality of the contract so as to defeat plaintiff's rights.

**23.** The record shows no indication of any violation by Hoffa or any connivance on his part in a violation by others.

**24.** There is no authority under Michigan law for the proposition that if one party to a contract breaches a fiduciary duty, the contract becomes illegal to the detriment of the other contracting party. See note 21 *supra*. The remedy for such a breach, as noted above, lies in a proceeding against the party guilty of the violation.

**25.** The escrow safeguards included in the Agreement were designed to protect the integrity of the Plan, and there is no claim here that such integrity would be in any jeopardy as a consequence of the final payment to Hoffa. In that sense, the legal situation today is equivalent to what it would have been the entire payment had been made to Hoffa in 1971. The escrow provisions cannot be converted by defendants to a purpose for which they were not intended.

■ Defendants assert in this respect that Hoffa should be required to repay the Plan for an alleged overpayment [26] because recovery of such overpayment is mandated by ERISA. That argument, too, suffers from several defects.

In the first place, it is not at all clear that there was an overpayment. Defendants assert that the Plan's actuary chose the wrong mortality table to calculate Hoffa's benefit, and that, had the correct table been used, the amount due to Hoffa would have been no more than $1,109,733.91.[27] In support of this theory, defendants proffer only the fact that, upon a review of the Plan and Hoffa's employment history, the Internal Revenue Service issued a "Technical Advice Memorandum" in November of 1975, "determining that the correct amount due Hoffa under the correct" actuary method would have been $1,109,733.91.[28]

Neither the IRS ruling nor the investigation underlying it is dispositive of the issue, and indeed, because of problems relating to admissibility of evidence, they do not even create a genuine issue of material fact.

The IRS ruling was issued solely on the basis of facts submitted to that agency by defendants' attorneys, and for that reason it clearly does not qualify as an independent factual investigation of the Plan or of the lump sum payment. Moreover, the IRS

chose not to litigate the validity of the lump sum payment to conclusion before the U. S. Tax Court but instead settled on an alternative approach embodied in a "closing agreement." [29] That agreement required the defendants to file the counterclaim present in this suit, and it further provided that, irrespective of the Court's ruling on the counterclaim, defendants were required to repay the Plan from Teamster funds [30] for any improper overpayment to Hoffa.[31] The agreement itself is nothing more than a settlement and it is not probative of facts in issue between the parties to the present lawsuit.

The possibility of testimony by the IRS agents who conducted the underlying investigation and who were otherwise involved in defendants' dispute with that agency likewise fails to create a genuine issue of material fact. These agents have indicated that they were not acting as expert witnesses, and they have acknowledged that IRS restrictions (26 U.S.C. § 6103) would require them to treat the investigation as confidential. Thus, their testimony would not be admissible at any trial in this Court. See Rule 56(e), Fed.R.Civ.P.; Rule 701, Fed. Rules of Evidence.

Beyond that, defendants' reliance on ERISA faces obstacles in the rules which govern the application of that statute to the present situation.

**26.** It is argued that on the same basis he would not be entitled to the last installment called for by the escrow provisions of the Agreement.

**27.** Indeed, it is said that a smaller annual benefit sum might well have been used appropriately by the actuary to calculate the total, thus lowering the total sum to $1,022,519.03.

**28.** Section 601.105(b)(5)(i) of the IRS procedural regulations defines "technical advice" as "... advice or guidance as to the interpretation and proper application of internal revenue laws, related statutes, and regulations, to a specific set of facts, furnished by the National Office upon request of a district office ...." Section (vii)(a) of that same section states that, "[u]nless the district director feels that the conclusion reached by the National Office ... should be reconsidered ..., his office will proceed to process the taxpayer's case on the basis of the conclusions expressed in the technical advice memorandum."

**29.** Because the closing agreement ended all disputes between the IRS and defendants, the former is not an indispensable party to this litigation, and complete relief under the Agreement can be awarded without the participation of the IRS.

**30.** Alternatively, they risk losing their tax–exempt status.

**31.** For that reason, too, any claim that defendants must recover the overpayment from Hoffa in order to maintain their fiduciary duties to the Plan's members and maintain the principles of the Treasury Regulations cannot stand. Cf. *Saffo v. Occidental Life Insurance Co. of California*, 602 F.2d 1265 (8th Cir. 1979), where it was held that, even where the officers of a Teamster local pension plan committed breaches of contract by reducing benefits to certain beneficiaries, the contract was binding on the plan notwithstanding any finding that it was not actuarially sound.

It has consistently been held that ERISA operates prospectively only, and that it may not be applied to affect the pension benefits of an employee whose work terminated prior to passage of the statute (even in situations where failure to pay a benefit may be regarded as a continuing breach of duty). *Martin v. Bankers Trust Co.*, 417 F.Supp. 923 (W.D.Va.1976), *aff'd*, 565 F.2d 1276 (4th Cir. 1977); *accord, Blazquez v. New York City District Council of Carpenters Pension Fund*, 463 F.Supp. 727 (S.D.N.Y.1979). ERISA was enacted in September of 1974, and it took effect in January 1975, while the facts giving rise to the present dispute of course long predate either event. ERISA also prohibits the restitution of benefits paid based on mistake of law (*Bacon v. Wong*, 445 F.Supp. 1189 (N.D.Cal.1978), and the general fiduciary obligations it creates are intended to apply to the merits of investments made on behalf of a beneficiary, not to correct mistakes made by the pension plan itself. See Note, *Fiduciary Standards and the Prudent Man Rule Under the Employee Retirement Income Security Act of 1974*, 88 Harv.L.Rev. 960, 965–6 (1975).

## VI

Finally, defendants argue that their Agreement with Hoffa is unenforceable because it is not supported by consideration.

▮▮▮▮▮ Courts do not generally inquire into the adequacy of consideration, and "any consideration, however slight, is legally sufficient to support a promise." *Sam-*

*bo's Restaurants v. City of Ann Arbor*, 473 F.Supp. 41, at 45 (E.D.Mich.1979); 1 *Williston on Contracts*, § 103 (3d ed., 1957); 17 Am.Jur.2d § 85.[32] As the court stated in *Higgins v. Monroe Evening News*, 404 Mich. 1, 6, 272 N.W.2d 537, 543 (1978)

> The essence of consideration ... is legal detriment that has been bargained for and exchanged for the promise .... The two parties must have agreed and intended that the benefits each derived be the consideration for a contract.[33]

Indeed, in Michigan, detriment to the promisee constitutes valid consideration even if there is no benefit to the promisor. *City of Highland Park v. Grant–Mackenzie Co.*, 366 Mich. 430, 115 N.W.2d 270 (1962); *Sambo's Restaurants v. City of Ann Arbor, supra.*

Defendants' basic position with regard to consideration is that, since they were under a pre–existing duty to pay Hoffa the required pension, there could have been no benefit to them nor any detriment to Hoffa as a result of the Agreement. See *Puett v. Walker*, 332 Mich. 117, 120, 50 N.W.2d 740, 743 (1952), quoting, *Doebler v. Rogge*, 221 Mich. 508, 191 N.W. 200 (1922). In elaboration, they suggest that Hoffa could have asserted his pension rights against defendants even in the absence of the Agreement, and that it was drawn for only two purposes: (1) to serve Hoffa's personal tax convenience, and (2) to protect the Plan and its members as required by law. They also contend that Hoffa himself agreed to opt for "whatever sum" to which, according to the Plan, he was entitled,[34] and that, since

---

**32.** "Valid consideration for a contract cannot be presumed merely because two parties receive benefit from each other. Rather, a bargained for exchange is required." *Higgins v. Monroe Evening News*, 404 Mich. 1, 6, 272 N.W.2d 537, 543 (1978).

**33.** See also, Calameria and Perillo, *Contracts* § 4–2, at p. 135 (2d ed. 1974).

**34.** Defendants further imply, but without evidentiary support, that the real reason for Hoffa's decision to receive the benefit was to expedite his chances for an early release from prison, and the deposition of Hoffa's attorney in the criminal case is cited in support of that

proposition. The transcript of that deposition shows that the attorney was not speaking for Hoffa, but was instead passing on the obvious: that Hoffa wanted to be released. The Court will judicially notice that few persons desire to remain in prison, and that most will go to great lengths to be relieved of confinement. See, A. Dumas, *The Count of Monte Cristo*; H. Charriere, *Papillon*. However, beyond that generality, there is no indication from the record that the Agreement was a sham by which Hoffa was manipulating the Teamsters or the Plan to help him gain his freedom.

this sum was merely a calculation of his past contributions, they did not benefit from the Agreement. These contentions overlook a number of legal and practical benefits to defendants and detriments to Hoffa.

■■■ Defendants were directly benefitted by that Agreement in that (1) it fulfilled their fiduciary obligations to a member of the Plan; (2) through the escrow provision, it protected the Plan from potential liabilities; and (3) it fulfilled their duties under the applicable Treasury regulations and the articles of the Plan itself.[35]

It is apparent that any preexisting duty which defendants may have had prior to the Agreement and Hoffa's retirement was superseded by the warranties made by them in the instrument,[36] and equally so that they offered the warranties to Hoffa as consideration for his agreement to set up the restricted escrow account.[37] Hoffa, in turn, suffered legal detriment to the extent that he was required to postpone receipt of the restricted amount for a period of almost five years and to rely on the representations made by defendants (a) that they had paid him the appropriate amount and (b) that they would release the escrow accounts upon finding that the Plan was in compliance with the IRS regulations.[38]

The Court finds that the Agreement was not invalid for lack of consideration.[39]

## VII

For the reasons stated, plaintiff is entitled to summary judgment on the third count of her complaint. The first and fourth counts were pleaded in the alternative to that count, and as a result of plaintiff's recovery thereon, they need not be addressed and shall be dismissed. Defend-

---

**35.** Obviously, Hoffa's benefit was to receive a warranted, certified cash payment from defendants, with defendants' detriment being that they had to tender a large amount of cash at the time of execution.

**36.** The Agreement itself states in paragraph 29 at p. 10:
"... all such representations and warranties shall survive the Closing and be enforceable thereafter in favor of the parties to whom given."

**37.** This is buttressed by paragraph 27, which specifically referred to the Agreement as a "binding and enforceable contract," thus further indicating the parties' intent both to the nature of the Agreement and to the element of consideration.

**38.** Hoffa's reliance on the Plan's actuary to calculate his payment and his failure to bargain for a specific amount strengthen rather than weaken plaintiff's position. Hoffa desisted from insisting upon immediate unconditional payment, or payment computed in accordance with his own standards or computations, and instead relied both on the computations made by defendants and on their warranties, and this may appropriately be regarded as a significant legal and practical detriment to him. See *Angelo Iafrate Co. v. Detroit & Northern Savings & Loan Assoc.*, 80 Mich.App. 508, 264 N.W.2d 45 (1978).

**39.** Defendants' reliance on the defense of accord and satisfaction must also fail, since there is no indication in the record that the parties reached such disposition. Hoffa's acceptance of a portion of his benefit (the first escrow release) was part and parcel of the terms of the contract. Under Michigan law, past payment of an undisputed claim does not operate to discharge a debt, and is only a "payment *pro tanto.*" *Risk v. Wells Market Service, Inc.*, 362 Mich. 414, 107 N.W.2d 776 (1961); *Monroe v. Bixby*, 330 Mich. 353, 47 N.W.2d 643 (1951).

It further follows from what has been stated that defendants' assertion of the statute of limitations is also without merit. Plaintiff's action is one for breach of contract. A civil action will not lie, and the statute of limitations cannot begin to run, until all the elements necessary for the maintenance of such an action are present before the adjudicatory body. See *Shulman v. Miskell*, 200 U.S.App.D.C. ——, 626 F.2d 173, No. 79–1293 (May 7, 1980). The established rule in the District of Columbia is that the statute of limitations for breach of contract runs from the date of the breach. *Zellan v. Cole*, 87 U.S.App.D.C. 9, 183 F.2d 139 (1950); and the same rule applies for breach of warranty. *Sears, Roebuck and Co. v. Goudie*, 290 A.2d 826 (D.C.App.1972), *cert. denied*, 409 U.S. 1049, 93 S.Ct. 523, 34 L.Ed.2d 501 (1972). See also, *Kosty v. Lewis*, 115 U.S.App.D.C. 343, 319 F.2d 744 (1963), *cert. denied*, 375 U.S. 964, 84 S.Ct. 482, 11 L.Ed.2d 414 (1964). Here, the breach did not occur until January 1, 1976, the date on which Hoffa was entitled to release of the escrow account. The action was timely filed on April 8, 1976.

ants' counterclaims must likewise be dismissed, in part because as a matter of law or on facts not in material dispute they lack intrinsic merit, in part because a finding for plaintiff on his claim acts as a barrier to recovery by defendants.

Therefore, it is this 3rd day of October, 1980,

ORDERED, That plaintiff's motion for summary judgment on Count III of the second amended complaint be and it is hereby granted and that judgment shall be entered in plaintiff's favor on the claim represented by that count, and it is further

ORDERED That defendants' motion for summary judgment be and it is hereby denied in all respects, and it is further

ORDERED That the American Security and Trust Company, in its position as depositary pursuant to the agreement of the parties, shall release to plaintiff the amount of $461,136.31, plus accumulated interest, currently held in escrow, and it is further

ORDERED That Counts I and IV of the second amended complaint and the amended counterclaims of defendants be and they are hereby dismissed.