RZEPKA v MICHAEL

Docket No. 93044. Submitted January 6, 1988, at Detroit. Decided October 3, 1988.

Mitchell Rzepka entered into a series of agreements with Personnel Recruiters Corporation International (hereafter Personnel), an employment agency, whereby Rzepka purchased the accounts receivable of Personnel. The receivables were comprised of fees owed Personnel by individuals who secured employment through Personnel. Rzepka issued a check for ⅔ of the face value of the receivables in exchange for Personnel's check, postdated six months, for the face value of the receivables and Personnel's promise to collect the accounts receivable. In an unrelated transaction with Opportunities News Corporation, a publisher of consumer discount coupon books operated by the same individuals who ran Personnel, Rzepka entered into an agreement whereby Rzepka paid Opportunities a sum of money and was granted a first option to purchase 14,400 coupon books for two sales districts in Oakland County. Rzepka subsequently purchased the coupon books under the option and Opportunities provided, at no cost to Rzepka, salesmen to sell Rzepka's coupon books. When Personnel subsequently could not honor four postdated checks Rzepka held in connection with the sale of Personnel's accounts receivable and Opportunities failed to supply the full number of coupon books Rzepka thought he was entitled to under his agreement with Opportunities, Rzepka brought an action in Oakland Circuit Court, Francis X. O'Brien, J., against Personnel, Opportunities and Raymond Michael, Suzanne Kay Sadler, Thomas E. Mallams and William K. Thompson, all of whom were employees of either Personnel

REFERENCES

Am Jur 2d, Equity §§ 28, 36 et seq.

Am Jur 2d, Judgments §§ 1091, 1092.

Am Jur 2d, Master and Servant § 408.

Am Jur 2d, Securities Regulations-State §§ 26-28.

What constitutes an "investment contract" within the meaning of state Blue Sky Laws. 47 ALR3d 1375.

What is an "investment contract" within the meaning of sec. 2(1) of the Securities Act of 1933 (15 USC sec. 77b(1)), defining the term "security" as including an investment contract. 3 ALR Fed 592.

or Opportunities. Plaintiff alleged fraud, breach of contract, violation of the Franchise Investment Law, violation of the Uniform Securities Act, conversion, fraudulent conveyance, and breach of fiduciary relationship. Prior to trial, plaintiff and Personnel stipulated to a consent judgment against Personnel on the breach of contract claim only. However, the consent judgment which was entered provided for the dismissal of the rest of the claims against Personnel. Plaintiff also obtained a default judgment against defendant Thompson. At trial, counsel for defendants Sadler and Mallams moved in his opening statement for a directed verdict in favor of his clients, arguing that the dismissal of the claims against Personnel under the securities and franchise statutes served to release his clients since they were agents of Personnel. The trial court took the motion under advisement. At the close of plaintiff's proofs, the trial court granted a motion by plaintiff to dismiss the fraudulent conveyance and breach of fiduciary relationship claims as to all defendants. At the conclusion of trial, the trial court found no evidence of fraud by defendants Sadler and Mallams, no evidence of breach of contract by defendants Sadler and Mallams, found no evidence of conversion and determined that the Franchise Investment Law did not apply to the transaction with Opportunities, and that the Uniform Securities Act did not apply to the transactions with Personnel. The trial court entered directed verdicts in favor of defendants Sadler and Mallams. A motion by plaintiff to set aside the consent judgment against Personnel on the basis of mistake was denied by the trial court. Plaintiff appealed, claiming error in the entry of the directed verdicts.

The Court of Appeals *held:*

1. A release of a servant operates to release the master and vice versa if the claim is based on a respondeat superior theory. In this case, the release of all claims against Personnel, except for the breach of contract claim, served to release defendants Sadler and Mallams from those claims as well.

2. The sale of Personnel's accounts receivable to plaintiff did not constitute a sale of securities or involve an investment contract within the meaning of the Uniform Securities Act.

3. Plaintiff's transaction with Opportunities is not within the purview of the Franchise Investment Law since no franchise was involved.

Affirmed.

1. JUDGMENTS — CONSENT JUDGMENTS — COLLATERAL ESTOPPEL.

The doctrine of collateral estoppel does not apply to consent

judgments, since claims are settled rather than actually adjudicated.

2. EQUITY — MISTAKE — WRITTEN INSTRUMENTS.

Mistake as to the legal effect of a written instrument, deliberately executed and adopted, constitutes no ground for relief in equity.

3. RELEASE — MASTER AND SERVANT — RESPONDEAT SUPERIOR.

The release of a servant operates to release the master and vice versa where the claim is based on a respondeat superior theory.

4. SECURITIES REGULATION — UNIFORM SECURITIES ACT — SALES OF ACCOUNTS RECEIVABLE.

A sale of accounts receivable is not a sale of securities which is subject to the requirements of the Uniform Securities Act where the purchaser does not subject his capital to the risk of the seller's enterprise and the purchaser has a right to the proceeds of the accounts receivable regardless of the solvency of the seller (MCL 451.801[1]; MSA 19.776[401][1]).

5. SECURITIES REGULATION — UNIFORM SECURITIES ACT — INVESTMENT CONTRACTS.

A transaction is an "investment contract" within the meaning of the Uniform Securities Act where it is a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificate or by nominal interests in the physical assets employed in the enterprise (MCL 451.801[1]; MSA 19.776[401][1]).

*Roger H. Leemis,* for plaintiff.

*Cross, Wrock, Miller & Vieson* (by *Francis X. Bujold, II),* for defendant Sadler.

*Liberson & Bock, P.C.* (by *Wanda M. Brush),* for defendant Mallams.

Before: MACKENZIE, P.J., and KELLY and L. P. BORRELLO,* JJ.

L. P. BORRELLO, J. Plaintiff claims an appeal

---

* Circuit judge, sitting on the Court of Appeals by assignment.

from a directed verdict of no cause of action as to individual defendants Sadler and Mallams following plaintiff's proofs. We affirm.

In addition to the judgment appealed from, a judgment was entered against defendant Opportunities News Corporation for $16,187.50. On May 23, 1986, an order was entered denying plaintiff's motion for reconsideration of a consent judgment dated March 3, 1986. The consent judgment was against defendant Personnel Recruiters Corporation International for $147,580 and against defendant Thompson for $163,767.50.

Defendants Michael, Thompson, Sadler, and Mallams were employees of defendant Personnel Recruiters Corporation International (hereafter Personnel), an employment agency which operated in seven states, including Michigan. Sadler was the president and sole shareholder of Personnel. Michael was the controller in charge of financing accounts receivable. Mallams supervised Personnel sales. Thompson was an employee active in both Personnel and Opportunities News Corporation.

When Personnel successfully placed a job applicant, the applicant signed a placement statement acknowledging that he or she owed Personnel a fee ranging from $1,200 to $2,400. If any placed applicants were laid off or terminated within the first year of employment, they received a prorated refund based on their earnings.

From 1976 to 1979, the refund rate for placed applicants who had lost their jobs was less than twenty percent. In order to facilitate the payment of the placement fees, Personnel arranged for financing of the placement fees at various financial institutions. However, because of the recession, by the end of 1979, financial institutions would no longer extend credit to successful applicants. In addition, employers which Personnel repeatedly

had utilized stopped hiring and began laying off the least-senior employees.

When the financial institutions ceased financing the placement fees, Personnel began its own payment plans for successful applicants in order to finance their fees. In most cases, Personnel set up six-month payment plans with a balloon payment at the end and the potential for an extension if necessary. Some applicants gave Personnel post-dated checks while others gave promissory notes on the balloon payments.

Michael testified that in late 1979 or early 1980, Personnel placed one newspaper ad and contacted financial brokers in an effort to obtain financing for their accounts receivable. Plaintiff, however, testified that he saw the newspaper ad in the fall of 1980. In any event, plaintiff did see the ad in the newspaper about a good investment for high profits. As a result of the ad, plaintiff contacted Personnel to inquire about making an investment; Michael testified that plaintiff represented himself as an experienced investor. Plaintiff was told about Personnel's problems and was referred to Personnel's bank and CPA, and was shown financial statements. Plaintiff also did his own independent investigation.

On November 17, 1980, Personnel and plaintiff entered into their first transaction entitled a "Finance Broker Agreement." Plaintiff's wife also entered into a similar agreement. Personnel paid plaintiff a fifteen percent return based on all cash payments received from the debtor applicant named in the agreement. Plaintiff did not like the percentage of his return on this investment. On June 2, 1981, plaintiff and Personnel entered into a transaction entitled "Accounts Receivable Purchase and Sale Agreement." This transaction involved the sale of accounts receivable at a discount

in which plaintiff gave Personnel a check for two thirds of the face value of the receivables in exchange for Personnel's postdated check for the face value of the receivables and Personnel's agreement to collect the receivables. Thereafter, plaintiff and Personnel entered into a series of similar agreements. Finally, on March 3, 1982, Personnel and plaintiff entered into another such agreement in which plaintiff purchased, for $67,930.40, accounts receivable with a face value of $101,895.09. This agreement provided that should an account balance be inaccurate or paid, accounts of equal value would be substituted. In each of these transactions, Personnel gave plaintiff a six-month postdated check.

Plaintiff testified that the purpose of the accounts receivable was to guarantee that the postdated checks for Personnel would be good. Plaintiff relied on cashing the postdated checks for repayment. Plaintiff also admitted that he had knowledge of Personnel's financial problems.

By July of 1982, Personnel had surrendered its license and fully ceased operations. At that time, plaintiff was holding four postdated checks which Personnel could not honor. There was no testimony as to the disposition of the uncollected accounts receivable.

The same individuals who operated Personnel operated defendant Opportunities News Corporation (hereafter Opportunities), which shared office space with Personnel. The purpose of Opportunities was to publish a consumer discount coupon book entitled "Thrift Gift Book." On December 4, 1981, Opportunities and plaintiff entered into an agreement entitled "Purchase Option," in which plaintiff paid Opportunities $9,324 and was granted a first option to purchase 14,400 books for the Pontiac and Avon sales districts in Oakland

County. Plaintiff paid $12.95 per book, less a five percent credit for each order. Plaintiff testified that he was told 50,000 books would be printed before Christmas of 1981, and many districts had already been sold. Plaintiff gave Opportunities a check for $16,187.50 for the option and purchase of the first books under the option. Personnel provided plaintiff, without charge, salesmen to sell the books.

On January 8, 1982, plaintiff received 30 books. On January 12, 1982, plaintiff received 600 books, and his salesmen had also received some books from Opportunities. Opportunities denied that it had promised plaintiff that 50,000 books would be published by Christmas of 1981. Plaintiff testified that he did not want to sell the books, and that salesmen assigned by Opportunities would do so. Plaintiff neither directed the salesmen nor advised them on how to operate. This endeavor also failed.

On December 23, 1982, plaintiff filed his complaint against all of the defendants, alleging: Count I—Fraud; Count II—Breach of Contract; Count III—Violation of the Franchise Investment Law; Count IV—Violation of the Uniform Securities Act; Count V—Conversion; Count VI—Fraudulent Conveyance; and Count VII—Breach of Fiduciary Relationship. At the end of the trial, plaintiff advised the court that he was not proceeding on Counts VI and VII, and the court thereupon dismissed those two counts.

On March 3, 1986, prior to the commencement of the trial, a consent judgment was entered against Personnel on the breach of contract claim only. The judgment stated in part:

It is hereby ordered that the remaining counts against Personnel Recruiters Corporation International be and they are dismissed with prejudice, but without costs or attorneys fees.

The consent judgment also included a default judgment against defendant Thompson. Shortly after the entry of the consent judgment, the trial commenced on March 3, 1986. In the opening statement of counsel for defendants-appellees Sadler and Mallams, counsel requested a directed verdict on the basis that since the consent judgment had dismissed the counts of violations of the securities and franchise laws as to the corporation, this also released the agents of the corporation as to those claims. Plaintiff responded by advising the court that he intended to show that defendants Sadler and Mallams made representations personally to plaintiff for which they should be held liable. On that basis, the court took defendants' motion under advisement and proceeded to trial.

At the conclusion of the trial, the trial court found as to Count I—Fraud, that there was no evidence of common-law fraud as to defendants Sadler and Mallams. As to Count II—Breach of Contract, there was no evidence against Sadler and Mallams that they had ever individually entered into a contract with plaintiff. As to Count III —Violation of the Franchise Investment Law, that defendant Opportunities was not a franchisor under the statute, and, therefore, since the Franchise Investment Law was not applicable to the corporation Opportunities, the act could not be applicable to the individuals Sadler and Mallams. As to Count IV—Violation of the Uniform Securities Act, MCL 451.810; 19.776(410), the court found that, since there was a consent agreement by way of a consent judgment, any claim of wrongdoing on behalf of Personnel would be dismissed in exchange for a consent judgment on another theory of liability, and with the corporation dismissed, the individuals were released. Also, the court found that the Uniform Securities Act was not applicable

since the plaintiff did not make an investment within the meaning of the act. As to Count v—Conversion, there was no evidence as to conversion. Counts VI and VII were abandoned. The court thereupon entered a directed verdict in favor of appellees Sadler and Mallams on Counts I through v.

Subsequently plaintiff filed a motion for what plaintiff termed "Reconsideration," but which the trial court correctly treated as a motion to set aside the consent judgment. The trial court found that if there was a mistake regarding the effect of the entry of the consent judgment, it was a unilateral mistake which did not justify the setting aside of the consent judgment. By order dated May 23, 1986, the trial court denied plaintiff's motion to set aside the consent judgment.

Plaintiff asserts that collateral estoppel and a "name and retain" argument were advanced as justifications for this directed verdict. However, the trial court did not grant defendants' directed verdict on estoppel grounds. In fact, the trial court said that collateral estoppel did not seem to be defendants' argument. Because claims are settled rather than actually adjudicated in a consent judgment, the doctrine of collateral estoppel does not apply to such judgments. *Van Pembrook v Zero Mfg Co,* 146 Mich App 87, 102-103; 380 NW2d 60 (1985), lv den 425 Mich 857 (1986); also see *Howell v Vito's Trucking & Excavating Co,* 386 Mich 37, 42; 191 NW2d 313 (1971).

In his motion to set aside the consent judgment, plaintiff in effect argued that he did not realize the legal effect of a consent judgment. Mistake as to the legal effect of a written instrument, deliberately executed and adopted, constitutes no ground for relief in equity. *Schmalzriedt v Titsworth,* 305 Mich 109; 9 NW2d 24 (1943); *Sinka v McKinnon,*

301 Mich 617; 4 NW2d 32 (1942); *Burgess v Holloway Construction Co,* 123 Mich App 505, 511; 332 NW2d 584 (1983).

The trial court granted defendants' directed verdict on, among other things, the ground that the consent judgment operated as a release of the individual defendants. MCL 451.810(b); MSA 19.776(410)(b) sets forth the statutory scheme of individual liability for violation of the Uniform Securities Act. The statute, on its face, states that the agents of the seller (the corporation) are jointly and severally liable "to the same extent" as the seller. It follows, therefore, that if the seller is not liable, then neither are the agents. In *Rittenhouse v Erhart,* 126 Mich App 674, 679; 337 NW2d 626 (1983), aff'd in part and rev'd in part, 424 Mich 166; 380 NW2d 440 (1985), this Court stated that "a release of a servant operates to release the master and vice versa if the claim is based on a respondeat superior theory."

The consent judgment acted as a release against the corporation on all counts except the breach of contract count. The corporation's liability on the other counts was derivative, and so the release of the corporation releases the employees. *Drinkard v William J Pulte, Inc,* 48 Mich App 67; 210 NW2d 137 (1973); *Willis v Total Health Care,* 125 Mich App 612, 617; 337 NW2d 20 (1983).

The trial court also granted defendants Mallams and Sadler a directed verdict as to Count IV on the ground that the transactions did not involve securities within the purview of the Uniform Securities Act. The act defines what constitutes a security and provides for a five-part test to determine whether a contractual or quasi-contractual arrangement involves a security within the meaning of the act. MCL 451.801(1); MSA 19.776(401)(1). The term "security" should be defined such that it

can be read in harmony with the other provisions of the act. *Melia v Employment Security Comm,* 346 Mich 544, 562; 78 NW2d 273 (1956); *In re Harris Estate,* 151 Mich App 780, 785-786; 391 NW2d 487 (1986).

In the instant case, to the extent that any lender of capital to an enterprise is subject to the risks of that enterprise failing, plaintiff's capital contributions to Personnel could be considered to have satisfied the second requirement of the five-part test. However, MCL 451.801(j)(6)(A); MSA 19.776(401)(j)(6)(A) states that "the terms defined in this subsection, [§ 401(j)] do not include: any bona fide loan." Subsection 401(j) defines the terms "sale," "sell," "offer," and "offer to sell." In addition, defining "security" to include bona fide loans would subject such loans to the filing and prospectus requirements in the statute. Such an interpretation would be absurd and should not be adopted. *Luttrell v Dep't of Corrections,* 421 Mich 93, 106; 365 NW2d 74 (1984).

A more reasonable interpretation is that the capital which is subject to the risks of the enterprise would need to be unsecured in order to fulfill the second requirement. In the instant case, the agreements at issue clearly set forth that plaintiff purchased, and Personnel sold, accounts receivable, with recourse, at a discount. Plaintiff received the accounts receivable in exchange for his capital. Regardless of what might happen to Personnel, plaintiff had a right to the proceeds of the receivables. The plaintiff did not subject his capital to the risks of the enterprise. Rather, plaintiff subjected his capital to the risks that the receivables listed in the agreements, or others of equal value, would not eventually be paid.

Plaintiff also argues that the purchase of accounts receivable amounted to an investment con-

tract and, therefore, falls within the definition of securities in MCL 451.801(1); MSA 19.776(401)(1). In *Securities & Exchange Comm v W J Howey Co,* 328 US 293, 298-299; 66 S Ct 1100; 90 L Ed 1244 (1946), the United States Supreme Court stated:

> [A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificate or by nominal interests in the physical assets employed in the enterprise.

The *Howey* test was adopted in Michigan in *Dep't of Commerce v DeBeers Diamond Investment, Ltd,* 89 Mich App 406, 411; 280 NW2d 547 (1979).

In the instant case, the purchase of the accounts receivable was more of an investment in those accounts rather than in the common enterprise. Finally, these transactions amounted to the purchase and sale of "accounts" as governed by the Uniform Commercial Code. See MCL 440.9106; MSA 19.9106, MCL 440.9105(b) and (i); MSA 19.9105(b) and (i), MCL 440.3104(1); MSA 19.3104(1) and MCL 440.8102; MSA 19.8102.

Plaintiff further argues that the trial court erred in determining that the transaction with Opportunities did not involve a franchise.

The "purchase option" between plaintiff and Opportunities did not amount to a franchise within the Franchise Investment Law, MCL 445.1501 *et seq.*; MSA 19.854(1) *et seq.* In the instant case, the "purchase option" set forth that plaintiff would have a first option for the sale of the book in the city or township of Pontiac and Avon. Such a statement does not amount to a

"marketing plan or system prescribed in substantial part by a franchisor" as required in MCL 445.1052(3); MSA 19.854(2)(3). Further, Opportunities is nowhere named in the book, and the "purchase option" does not state that plaintiff may use Opportunities' trademark, service mark, trade name, logotype, advertising, or other commercial symbol which would designate Opportunities as the franchisor. Finally, plaintiff's purchase of the first option does not meet the definition of a "franchise fee" because it was not paid in exchange for the right to enter into a business under a "franchise agreement." The "purchase option" states only that plaintiff purchased the first option and the books. The "purchase option" fails the definition of a "franchise fee" pursuant to MCL 445.1503(1)(a); MSA 19.854(3)(1)(a).

Affirmed.