**GROUPO CONDUMEX,**
**etc., Plaintiff(s)**

v.

**SPX CORP., et al., Defendant(s)**

**No. 3:99CV7316.**

United States District Court,
N.D. Ohio,
Western Division.

Aug. 28, 2001.

Anthony J. Rotondi, Cleary, Gottlieb, Steen & Hamilton, Howard Zelbo, Cleary, Gottlieb, Steen & Hamilton, Jeffrey A. Rosenthal, Cleary, Gottlieb, Steen & Hamilton, New York City, Jessica Zeldin, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, Margaret G. Beck, Fuller & Henry, Martin J Witherell, Fuller & Henry, Mary A Whipple, Fuller & Henry, Toledo, OH, Robert T. Greig, Cleary, Gottlieb, Steen & Hamilton, New York City, Plaintiffs.

Evan S. Williams, Gardner, Carton & Douglas, Chicago, IL, James P. Silk, Jr., Spengler Nathanson, Toledo, OH, John F. Ward, Jr., Jenner & Block, Michael E. Barry, Gardner, Carton & Douglas, Chicago, IL, Theodore M. Rowen, Spengler Nathanson, Truman A. Greenwood, Spengler Nathanson, Jacqueline M. Boney, Cooper, Walinski & Cramer, Joseph P. Thacker, Cooper & Walinski, Richard S. Walinski, Cooper & Walinski, Toledo, OH, David C. McBride, Young, Conaway, Stargatt & Taylor, John W. Shaw, Young, Conaway, Stargatt & Taylor, Josy W. Ingersoll, Young, Conaway, Stargatt & Taylor, Wilmington, DE, Patricia B. Fugee, Cooper & Walinski, Toledo, Peter C. John, Williams, Montgomery & John, Ltd., Chicago, IL, for Defendants.

## ORDER

CARR, District Judge.

At present, this lawsuit involves claims between the defendant/cross-claimant Dana Corporation (Dana) and defendant/cross-defendant SPX Corporation (SPX), which has also filed claims against Dana. Pending are dispositive cross-motions on the parties' claims against each other.

This case began with a suit by plaintiff Groupo Condumex, S.A. de C.V. (Condumex), a Mexican corporation, against SPX and Dana, and also against Sealed Power Technologies of Nevada (SPN), a subsidiary of SPX. Condumex filed its complaint after Dana, as part of a larger asset purchase transaction between Dana and SPX, purchased SPN from SPX.

At the time of that transaction, SPN and Condumex jointly owned a subsidiary, Promotora de Industrias Mecanicas, S.A. de. C.V. (Promec), a Mexican corporation. SPN owned forty percent of the shares in Promec, and Condumex owned all, or nearly all, of the remaining shares. The shareholder agreement between Condumex and SPX contained a right of first refusal relat-

ing to the Promec shares held by each of the joint owners.[1] The Promec bylaws also contained a right of first refusal. Immediately on becoming aware that SPX was planning to sell SPN to Dana, Condumex complained to SPX that the transaction would violate its right of first refusal.

In response, SPX took the view that it was selling SPN, not the Promec shares (which were SPN's sole asset). In SPX' view, therefore, the SPX–Dana transaction did not trigger Condumex' right of first refusal.

As a result of Condumex' protests, SPX and Dana were aware before the closing of their transaction that Condumex claimed that SPX was ignoring its right of first refusal.

After the closing and transfer of SPN to Dana (and thereby, Dana's acquisition of the Promec shares), Condumex brought this suit. In an earlier decision, I ruled that the transfer, as Condumex claimed, violated the right of first refusal contained in the 1981 SPX–Condumex shareholders' agreement. (Doc. 211). I ordered Dana to transfer the Promec shares to Condumex.[2]

Shortly after issuance of that order, Dana brought its pending cross-claim against SPX, which, in turn, filed claims against Dana. In essence, each asserts that it is entitled to indemnification for losses incurred as a result of my determination that transfer of the Promec shares to Dana

via its purchase of SPN breached Condumex' right of first refusal.

## Discussion

### I. Limitation of Indemnification by SPX

In asserting its indemnification claim against SPX, Dana relies on two provisions in its asset purchase agreement with SPX. The first of these, § 3.2 of the asset purchase agreement, contains a warranty by SPX that "no person has any … right of first refusal … in connection with … shares" being transferred under the agreement. There is no dispute that, in light of my earlier decision, SPX breached the warranty relating to rights of first refusal.

The other provision on which Dana relies is § 10.1(b)(i). In that provision, the interpretation of which is disputed, SPX agreed to indemnify and hold Dana harmless against all "Liabilities … resulting from or arising out of"

> any inaccuracy of any representation or warranty made by [SPX], … (but only, with respect to Transferred Subsidiaries other than the Controlled Subsidiaries and their subsidiaries, other than with respect to those representations and warranties contained in §§ 3.1 and 3.2, to the extent [SPX] has knowledge of the facts or circumstances constituting such inaccuracy (and with respect to the Mexican investments held by [SPN], only such knowledge [as][SPX] has without having undertaken any additional inquiry or investigation)) ….

1. SPX, rather than SPN, was a party to the Promec shareholder agreement with Condumex because SPX and Condumex had originally created Promec. Thereafter, SPX created SPN, transferring its Promec shares to SPN.

2. After Dana complied with the order to transfer the Promec shares to Condumex, Dana and Condumex settled all matters in dispute between them. Condumex returned

the shares to Dana, which, apparently, had made arrangements that were satisfactory to Condumex concerning another Mexican subsidiary, and competitor of Promec, in which Dana had an interest. Part of this settlement involved assignment by Condumex to Dana of claims that Condumex had asserted against SPX. The pending motions do not relate to any of the claims that Condumex assigned to Dana.

According to Dana, this provision makes SPX liable for the losses it incurred as a result of being sued by Condumex and forced to transfer SPN's Promec shares to Condumex. SPX contends that this provision relieved SPX of any duty to indemnify Dana for any losses resulting from Condumex' successful assertion of a right of first refusal with regard to the Promec shares.

For the reasons that follow, I conclude that § 10.1(b)(i) is not ambiguous,[3] and that it, as SPX argues, relieves SPX of any liability for its breach of the warranty relating to Condumex' rights of first refusal, provided that it did not have actual knowledge of such breach. I conclude, further, that it had no such knowledge, because no breach was known to it before I entered my decision in favor of Condumex, and ordered Dana to deliver the Promec shares to Condumex.

### A. Transfer of the Promec Shares

 At the outset of my discussion of § 10.1(b)(i), I note that the parties agree that the phrase, "transferred subsidiaries other than controlled subsidiaries and their subsidiaries," means an entity known as Allied Ring. In addition, the phrase "the Mexican investments held by [SPN]," means the Promec shares held by SPN.

The indemnity provision thus can be read as an indemnification against "Liabilities ... resulting from or arising out of:"

any inaccuracy of any representation or warranty made by [SPX], ... (but only, with respect to Allied Ring, other than with respect to those representations

and warranties contained in §§ 3.1 and 3.2, to the extent [SPX] has knowledge of the facts or circumstances constituting such inaccuracy (and with respect to the Promec shares, only such knowledge [as][SPX] has without having undertaken any additional inquiry or investigation)). . . .

SPX argues that, when viewed in light of basic grammatical principles and other provisions in the agreement, this language means, and the parties intended it to mean:

1. With regard to Allied Ring, SPX would indemnify Dana for any breach of warranty only to the extent that it had knowledge of the facts and circumstances constituting any inaccuracy in the warranty, except that,

2. With regard to Allied Ring, SPX would indemnify Dana for any breach of the warranties in §§ 3.1 and 3.2 regardless of whether it had any knowledge about any inaccuracy in those two warranties; and

3. With regard to the Promec shares, SPX would indemnify Dana for any breach of warranty only to the extent that it had knowledge, without undertaking any additional inquiry or investigation, that the warranty was inaccurate.

Dana argues that the provision means, and the parties intended it to mean:

1. Except for the warranties in §§ 3.1 and 3.2, a breach of warranty will be found only where SPX had knowledge of

---

3. This is not a decision I anticipated reaching prior to having heard the parties' oral argument. At the outset of that session, I told counsel that I had spent "countless hours ... trying to make sense of that segment of section 10.1B1 (sic), and I cannot.... [M]y present view is it makes no sense." (Tr. 11, Doc. 67). Having challenged counsel to "persuade me this morning that the language is, quote,

plain and clear," *id.*, I conclude, in light of their arguments, that what appeared to be incomprehensible can, indeed, ·be comprehended. Complexity causing difficulty of comprehension differs from ambiguity creating uncertainty of meaning. Here, the arguments of counsel clarified the complexities of this provision and made its meaning clear.

the facts and circumstances constituting such breach; and

2. With regard to the Promec shares, except for the warranties made in §§ 3.1 and 3.2, a breach of warranty will be found only if SPX had knowledge about any inaccuracy in a warranty without undertaking any additional inquiry or investigation; and

3. With regard to the warranties in §§ 3.1 and 3.2, there is no such knowledge limitation, and those warranties are, accordingly, unrestricted and absolute.

I agree with SPX that basic rules of grammar—in particular, the "last antecedent rule"—support its interpretation of this provision. That rule provides that, "Ordinarily, qualifying phrases are to be applied to the words or phrase immediately preceding and are not to be construed as extending to others more remote." *United States v. Pritchett*, 470 F.2d 455, 459 n. 9 (D.C.Cir.1972). As stated in a treatise, "Referential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent[, which consists of] the last word, phrase, or clause that can be made an antecedent without impairing the meaning of the sentence." Norman Singer, 2A Statutes and Statutory Construction § 47:33 (6th ed.2000) (footnote and internal quotation marks omitted); *see also City of Toledo v. Beazer Materials and Services, Inc.*, 912 F.Supp. 1051, 1059 (N.D.Ohio 1995), *rev'd on other grounds*, 103 F.3d 128 (6th Cir.1996) (unreported).

Applying the last antecedent rule to the disputed provision as *underscored, italicized,* and **highlighted** as follows,

any inaccuracy of any representation or warranty made by [SPX], ... (*but only, with respect to Allied Ring, other than with respect to those representations and warranties contained in §§ 3.1 and 3.2, to the extent [SPX] has knowledge of the facts or circumstances constituting such inaccuracy* (and with respect to the Promec shares, **only such knowledge [as][SPX] has without having undertaken any additional inquiry or investigation**))... [,]

I conclude that:

1. The underlined clause [*"other than with respect to those representations and warranties contained in §§ 3.1 and 3.2"*] refers only to Allied Ring. As a result, the warranties in §§ 3.1 and 3.2 are not included in the ensuing knowledge qualification solely with regard to Allied Ring; and

2. The §§ 3.1 and 3.2 warranties are, under the last antecedent rule, otherwise qualified, along with all the other warranties, by the knowledge qualification in the ensuing language, because I further conclude that:

3. The italicized language [*"but only, with respect to Allied Ring..., to the extent [SPX] has knowledge of the facts or circumstances constituting such inaccuracy"*] qualifies the preceding phrase, "any inaccuracy of any ... warranty made by [SPX]". As a result, (except, with regard to Allied Ring, the §§ 3.1 and 3.2 warranties) all warranties are limited to knowledge on the part of SPX of facts and circumstances constituting such inaccuracy; and

4. The boldfaced language [**"only such knowledge [as][SPX] has without having undertaken any additional inquiry or investigation"**] refers to the italicized antecedent, *"knowledge of the facts or circumstances constituting such inaccuracy"*—with the italicized *"such inaccuracy"*, as noted in ¶ 3, above, referring to "any inaccuracy of any ... warranty made by [SPX]". As a result, all warranties are limited, with regard to Promec, to knowledge of the facts and

circumstances constituting such inaccuracy without SPX having undertaken any additional inquiry or investigation.

In reaching this conclusion, and applying the last antecedent rule, I have, in ¶ 4, also interpreted the boldfaced words "**such knowledge**," as used in "**only such knowledge [as][SPX] has**" as incorporating the prepositional phrase ("*of the facts or circumstances constituting such inaccuracy*") that qualifies the word "*knowledge*" in the italicized clause. This is necessary, because "**such knowledge**" can only refer to "*knowledge*," which, in turn, is qualified by the prepositional phrase "*of the facts and circumstances constituting such inaccuracy.*"

In view of the last antecedent rule, I reject Dana's argument that the exception from the knowledge limitation on the warranties created by the underscored language ("*other than with respect to those representations and warranties contained in §§ 3.1 and 3.2*") applies not only to Allied Ring, but springs forward to apply to Promec as well. To accept Dana's argument would require reading that language as applying simultaneously to its last antecedent (Allied Ring) and to a later term.

To be sure, the last antecedent rule "is not an inflexible rule, and is not applied where the context indicates otherwise." *Pritchett, supra*, 470 F.2d at 459; *see also Hearn v. Western Conf. of Teamsters Pension Trust Fund*, 68 F.3d 301, 304 (9th Cir.1995) (the last antecedent rule must yield to the most logical meaning of a statute that emerges from its plain language and legislative history.).

In this case, the context, rather than indicating otherwise, supports application of the last antecedent rule. The context for this provision was Condumex' complaint about the violation of its right of first refusal. There can be no dispute (*see* Tr. 92) that the parties were acutely aware of Condumex' objection to Dana's acquisition of the Promec shares. That objection frames the negotiations leading to the final version of § 10.1(b)(i), which allocates the risk to the transfer of the Promec shares resulting from Condumex' contention that it had a right of first refusal.

Other provisions of the asset purchase agreement manifest the parties' intent, apparent in § 10.1(b)(i) when the last antecedent rule is applied, to shift to Dana the risk arising from Condumex' complaints about violation of its right of first refusal. These provisions state that Dana could, pursuant to:

1) § 5.1(b), conduct its own investigation regarding the Promec shares;

2) § 8.5, terminate the entire transaction if dissatisfied with what it found; or

3) § 10.1(b)(ii), postpone closing until it became satisfied.

Like § 10.1(b)(i), when read in light of the last antecedent rule, these provisions reflect an agreement that Dana assume the risks arising from Condumex' complaints.

Section 5.1(b) states:

Buyer will continue its pre-acquisition review of the books, records and facilities of SPT NV and its investments.... Buyer shall use its best efforts to act promptly to conclude such review after the date hereof and Buyer shall notify Seller at the conclusion of such pre-acquisition investigation of all matters then known to Buyer, which in the reasonable judgment of Buyer are of such significance as to be reasonably likely to materially and adversely affect the business, assets, financial condition, or results of operations of SPT NV and its subsidiaries, taken together and Buyer shall have the right to terminate this Agreement as set forth in Section 12.1(e), notwithstanding the fact that

such matters may have been disclosed in the Schedules to this Agreement.

This provision not only entitles, but obligates Dana to undertake a pre-closing review of SPN and "its investments" (i.e., the Promec shares, which were SPN's sole asset). This provision allowed Dana to do that which, under any reading of § 10.1(b)(i), SPX was not going to do— undertake further investigation into the affairs of Promec, including the status of the right of first refusal being asserted by Condumex. Section § 5.1(b) takes from SPX, and allocates to Dana, the risks of not knowing or learning enough.

That intent is also apparent from § 8.5, which provides that Dana has no obligation to close until it was "satisfied, in its sole discretion, as to the prospects for developing a suitable working relationship with the management of [Promec] and as to all other aspects of the operations, assets, finances and governance of such enterprise." Here, again, Dana, based on what it learned about its ability to work with Promec, could decide what to do. It had the unilateral right to postpone closing (just as it had the unilateral right to terminate the transaction entirely under § 5.1), until it alone was satisfied that it could get what it wanted, or could accept what it was getting, from its forthcoming investment in Promec.

Section § 10.1(b)(ii) likewise manifests a shifting of the risk regarding Promec to Dana. The indemnification provision in this section relates to any failure by SPX "to perform any covenant or agreement . . . or fulfill any other obligation . . . except to the extent that such failure arises due to acts or omissions of the Mexican investments held by [SPN]" (i.e., Promec). Though Dana does not seek recovery under this provision, its presence in the asset purchase agreement reinforces my conclusion that § 10.1(b)(i), viewed in light of § 10.1(b)(ii) and other provisions, manifested an intent to allocate to Dana the risks of proceeding in the face of Condumex' complaints about its right of first refusal.

Dana suggests that parties normally allocate risk by means of the warranties that they negotiate, and that an indemnity provision merely states what happens when a warranty is breached. (Tr. 16). Thus, according to Dana, the restrictive reading § 10.1(b)(i) urged by SPX is not sensible, because it presumes that SPX, contrary to normal practice, was using the indemnification provision, rather than the warranty provision, to allocate the risk of an invalid transfer of the Promec shares to Dana.

I disagree that the separation between risk allocation and remedy is as sharp in this contract as Dana contends. Without question, the parties were aware of Condumex' claims and that they posed some risk to the transfer of the Promec shares. They mutually believed (but did not, apparently, have absolute confidence in their rationalization), that no right of first refusal was breached because the shares of SPN, rather than Promec, were being transferred. Each, accordingly, wanted to place the risk that their assumption might be mistaken onto the other.

SPX was willing to warrant that no right of first refusal was being violated—that warranty reflected the parties' common understanding of what they thought was true. SPX did not, however, want to be responsible for losses that Dana might incur if that shared belief turned out to be mistaken. There was nothing inappropriate or unreasonable in SPX' effort to limit its liability if the warranty were found to have been breached. SPX sought, in other words, to limit its exposure if the transfer were invalidated by narrowly limiting the scope of the indemnity that it was willing to offer. The effectiveness of such risk

minimization does not, contrary to Dana's argument, depend on where in the contract it was located.

Dana also argues that the asset purchase agreement reflects a distinction in the treatment of controlled subsidiaries (i.e., those, like Allied Ring, in which SPX owned or controlled more than fifty percent of the shares) and noncontrolled subsidiaries (i.e., those, like Promec and others, in which SPX owned or controlled less than fifty percent of the shares). I disagree: though some such distinction may be apparent in the treatment of Allied Ring and Promec in § 10.1(b)(i), that distinction does not recur elsewhere. Thus, § 5.1(b), which requires Dana to investigate the Promec situation further, and allows it to terminate, relates only to that noncontrolled subsidiary, and none other.

I conclude, accordingly, that application of the last antecedent rule, as urged by SPX, results in "the most logical meaning," *Hearn,* supra, 68 F.3d at 304, of § 10.1(b)(i) and the asset purchase agreement as a whole. Thus, as asserted by SPX, its warranty that no person had a right of first refusal in connection with any shares being transferred under the agreement was limited, with regard to Promec, to the extent that it had knowledge of facts or circumstances that made such representation inaccurate without having undertaken any additional inquiry or investigation.

## 1. Knowledge on the Part of SPX

Dana argues that, even if SPX' indemnification obligation in § 10.1(b)(i) was limited, it nonetheless is entitled to indemnification because SPX knew about Condumex' right of first refusal regarding the Promec stock. The issue thus raised is whether SPX, as of the closing, had, as required under § 10.1(b)(i), "knowledge of the facts and circumstances" of the "inaccuracy" of the warranty, given under § 3.2, that "no person has any . . . right of first refusal."

There is no dispute that SPX was aware of the terms of 1981 shareholders' agreement between it and Condumex and, as well, of Promec's bylaws, both of which included a right of first refusal with regard to the Promec stock. Mr. Sheridan, SPX' general counsel, testified that, according to his understanding, if "we wish to make a disposition of our shares in Promec, we would have to offer them to the other shareholder [Condumex], who would have the opportunity to meet the other offer." (Sheridan Dep., Aug. 12, 1999, at 64–66).[4]

In addition, in 1989, Mr. Sheridan had sought consent from Condumex to an earlier transfer of the SPX' Promec shares that resulted from the sale of the subsidiary which then held the shares. SPX points out, however, that this request for Condumex' approval was not based on a belief that such approval was required by either the 1981 shareholders' agreement or the Promec bylaws. The request originated, rather, from the Goldman Sachs investment firm, which was involved in the overall transaction of which the transfer of the subsidiary holding the Promec shares was a part. According to Sheridan, "[I]t wasn't my view that they had a right to consent or not consent. We were selling a subsidiary." (*Id.* at 70).

Also known to SPX at the time of closing was that Dana was obligated under

---

4. Dana also points to testimony by Condumex' former President, Julio Gutierrez, about a conversation he had with Robert Tuttle, former president of SPX, about the right of first refusal. Knowledge learned or manifested by Mr. Tuttle in that conversation is not, however, attributable to SPX. Section 14.10 of the asset purchase agreement limits the meaning of the term "knowledge," as used in the agreement, to knowledge had by persons listed in a schedule attached to the agreement. That list does not include Mr. Tuttle.

§ 5.1(b) to undertake a pre-closing review of SPN and "its investments." Dana, moreover, had the option of either postponing the closing under § 8.5, or terminating the transaction entirely under § 5.1(b). Dana did not seek either to postpone the closing or terminate the transaction, and its decision to proceed following whatever investigation it undertook was among the "facts and circumstances" pertinent to SPX' knowledge of the inaccuracy of its warranty.

SPX also points out that, prior to and as of the time of the closing, Condumex was asserting a right of first refusal based on the Promec bylaws, rather than on the 1981 shareholders' agreement. SPX and Dana were of the view that any right of first refusal was inapplicable, because their transaction involved a transfer of SPN stock, rather than of the Promec shares. As SPX further notes, my earlier order, requiring Dana to transfer the Promec shares to Condumex, was based on a finding that the 1981 shareholders' agreement, which Condumex had not referenced in its pre-closing objections, was violated by SPX' indirect transfer of the Promec shares to Dana via the sale of the SPN stock.

My decision and ensuing order, SPX argues, rather than anything known to it as of the time of closing, caused its warranty about the absence of a right of first refusal to be inaccurate. In its view, it, no more than Dana, could, as of the closing, have deemed its warranty to be inaccurate. That Dana shared not only its understanding of the "facts or circumstances," but its understanding of the significance of those facts and circumstances, SPX asserts, is clear from the arguments that Dana made during the earlier proceedings against Condumex' claim of a right of first refusal.

It is also noteworthy that § 10.1(b)(i) relieved SPX of an obligation to undertake,

with regard to the Promec shares, "any additional inquiry or investigation." This provision contrasts with the obligation imposed on Dana under § 5.1(b) to undertake a pre-closing review of SPN and "its investments" (i.e., the Promec shares).

These contrasting provisions indicate an intent to distinguish between the knowledge—i.e., constructive knowledge—that Dana could gain through due inquiry and investigation, and actual knowledge on the part of SPX, which was not required to undertake "any additional inquiry or investigation." Under the asset purchase agreement, Dana was charged with constructive knowledge of SPN and "its investments," while, with respect to any right of first refusal, SPX was held to actual knowledge.

Courts in Michigan, whose law applies in this case, have noted the distinction between constructive and actual knowledge of a future risk of injury. In *Travis v. Dreis and Krump Mfg. Co.*, 453 Mich. 149, 170–4, 551 N.W.2d 132 (1996), the Michigan Supreme Court stated that use of the term "actual knowledge" in a statute "meant that constructive, implied, or imputed knowledge is not enough." Under this standard, the court held, a plaintiff's intentional tort claim can prevail only where "a supervisory or managerial employee had actual knowledge that an injury would follow from what the employer deliberately did or did not do." Actual knowledge, in the context of an intentional tort, is "knowledge of facts from which it could be concluded that the employee had the requisite intent to injure"; *i.e.*, whether, based on the facts known to the defendant, the employee faced a certain risk of injury. *McNees v. Cedar Springs Stamping Co.*, 219 Mich.App. 217, 221, 555 N.W.2d 481 (1996).

In some contexts, however, the party charged with actual knowledge need not

have known that future injury was certain. In a prisoner civil rights action, the Sixth Circuit has held that "actual knowledge" does not require that a prison official know that a prisoner would, with certainty, be harmed, or that a particular prisoner would be harmed in a certain way. But the defendant must still be shown to have been aware of a "substantial risk of serious harm." *Curry v. Scott,* 249 F.3d 493, 507 (6th Cir.2001) (citing *Farmer v. Brennan,* 511 U.S. 825, 842, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)); *see also Rosa H. v. San Elizario Indep. Sch. Dist.,* 106 F.3d 648, 659 (5th Cir.1997) ("Title IX liability for sexual harassment will not lie if a student fails to demonstrate that the school district actually knew that the students faced a substantial threat of sexual harassment.")

The components of "actual knowledge" with respect to an anticipated harm have also been discussed in ERISA cases. In *Babcock v. Hartmarx Corp.,* 182 F.3d 336, (5th Cir.1999), the court stated that "actual knowledge requires that the [plaintiffs] know not only of the events constituting the breach [of defendant's fiduciary duty], but 'also that those events supported a claim for breach of fiduciary duty or violation under ERISA.'" (citing *Maher v. Strachan Shipping Co.,* 68 F.3d 951, 954 (5th Cir.1995)).

■ The issue in this case is whether SPX had "knowledge of the facts and circumstances . . . without having undertaken any additional inquiry or investigation" of the "inaccuracy" of the warranty that "no person has any . . . right of first refusal." Among the "facts and circumstances" comprising what was known to SPX was the risk that Condumex would seek enforcement of, and might prevail on, its claim of a right of first refusal under the Promec bylaws.[5]

SPX' knowledge that the Promec bylaws contained a right of first refusal, which Condumex might seek to enforce, did not give it actual knowledge that its warranty about the lack of any such right was inaccurate. The foregoing cases require that a party anticipate that a risk of harm or injury be at least substantial, if not certain, before actual knowledge of the risk of such harm or injury can be established. I conclude that SPX must have anticipated a similarly substantial likelihood that Condumex would assert and prevail on its claim before it can be charged with having had actual knowledge of the inaccuracy of its warranty.[6]

Further, the knowledge standard in § 10.1(b)(i) mandates that SPX must have knowledge of "facts or circumstances *constituting* such inaccuracy." Dana cites several opinions interpreting "constituting" as used in different contexts. *Rothman v. Gregor,* 220 F.3d 81, 97–98 (2d Cir.2000) (construing 15 U.S.C. § 78l(e)); *Advocacy Org. for Patients and Providers v. Auto Club Assoc.,* 176 F.3d 315, 322 (6th Cir. 1999) (applying Fed.R.Civ.P. 9(b)); *Dayco Corp. v. Goodyear Tire & Rubber Co.,* 523

---

5. Because Condumex was not asserting a right under the shareholders' agreement, SPX was not required to take the possibility of a claim under that agreement into consideration, or view that possibility as being among the "facts and circumstances" of which it had knowledge.

6. Dana argues that SPX is liable for its breach of warranties that occurred after the closing date, regardless of whether SPX believed, in good faith, that the right of first refusal would

not be triggered, citing *Metropolitan Coal Co. v. Howard,* 155 F.2d 780 (2d Cir.1946) (involving warranty for barge) and *Hoffa v. Fitzsimmons,* 499 F.Supp. 357 (D.D.C.1980) (involving retirement agreement). Those cases are distinguishable from the present case, however, because the SPX/Dana Agreement contained a knowledge limitation for SPX's warranty, which was not present in either the *Metropolitan* or the *Hoffa* case.

F.2d 389 (6th Cir.1975) (reviewing the particularity requirements for Rule 9(b)). Each of the above decisions, however, involved different factual circumstances than those in the present case. Instead of applying the meaning given by these courts, I will rely on the plain meaning of "constituting."

Constitute is defined as: "to appoint to an office, function or dignity; to set up, establish as, enact, found, to give due or lawful form to, to legally process; and to make up, form, compose." Webster's Ninth New Collegiate Dictionary, 1986, pg. 281.

Under this definition, I find that "constituting", in the context of the asset purchase agreement, means the sum of independent parts, as they are "made up" or given "lawful form."

Nothing in the present record suggests—much less shows—that SPX had actual knowledge of facts and circumstances constituting a substantial likelihood that Condumex would assert and prevail on its claim that it had a right of first refusal applicable to the transfer to Dana, via the sale to it of SPX' SPN asset, of the Promec shares. Absent such knowledge, SPX is entitled to summary judgment on Dana's claim for indemnification based on the breach of the warranty as to the Promec shares.

### B. Transfer of the SPN Shares

Dana also argues that SPX is liable for indemnification based on its breach of warranties as to SPN. According to Dana, SPN's shares were encumbered, because Condumex had a right to acquire the Promec shares, SPN's sole asset, thus breaching §§ 10.1(b)(i) and 3.2 warranties of the asset purchase agreement.

### 1. Knowledge Limitation Applies to SPN

Dana argues that § 10.1(b)(i)'s knowledge limitation, found in the parenthetical, applies only to the non-controlled subsidiaries. Because SPN is a controlled subsidiary, Dana argues that the §§ 3.1 and 3.2 warranties are unlimited as to SPN.

I have found, however, that § 10.1(b)(i)'s warranties are limited to knowledge on the part of SPX of facts and circumstances constituting such inaccuracy, without distinction between controlled and non-controlled subsidiaries (with the exception of Allied Ring), because "but only .... to the extent Seller has knowledge of the facts or circumstances constituting such inaccuracy" refers back to "any inaccuracy of any representation." See, Section I. A., Transfer of the Promec Shares, supra. Thus, § 10.1(b)(i)'s knowledge limitation applies to controlled subsidiaries, including SPN.

### 2. Dana Has Not Demonstrated SPX' Actual Knowledge of a § 3.2 Breach

According to Dana, SPX breached the §§ 3.2 and 10.1(b)(i) warranties because SPN's shares were encumbered, as Condumex had a right to acquire the Promec shares, SPN's sole asset. As discussed above, however, I find that Dana has not presented any evidence that SPX had actual knowledge of facts and circumstances constituting a substantial likelihood that Condumex would assert and prevail on its claim that it had a right of first refusal to the Promec shares. See Section I.A. 1., Knowledge on the Part of SPX, supra. Dana, therefore, has not demonstrated that SPX had actual knowledge of the facts and circumstances constituting the breach of § 3.2 warranties as to SPN.

### 3. SPN's Shares Were Not Encumbered

Furthermore, I find that SPN's shares were not encumbered, and thus SPX did not breach the § 3.2 warranties with regard to SPN.

The Promec shares were an *asset* of SPN, and Condumex' right of first refusal did not relate to SPN's *shares.* As such, Dana has not presented any evidence that SPN's shares were encumbered. *See Foster v. Cone–Blanchard Mach. Co.,* 460 Mich. 696, 702, 597 N.W.2d 506 (1999) (discussing different rules for successor liability when acquisition accomplished by shares of stock as consideration or accomplished by an exchange of assets); *Comm'r v. Southern Bell Tel. & Tel.,* 102 F.2d 397, 402 (6th Cir.1939) (noting difference between sale of stock and sale of assets).

I recognized in my December 3, 1999 order that Condumex's right of first refusal applied only to the transfer of Promec shares and did not encumber SPX's right to transfer the SPN shares:

> Dana also argues that the State of Nevada, where SP Nevada is incorporated, prohibits restraints on the alienation of the shares of SP Nevada. Because the shareholders' agreement relates only to shares of Promec this argument is unavailing.

Doc. 211 at 15, n. 2.

Dana has not presented any evidence that SPX breached its §§ 3.2 and 10.1(b)(i) warranties with regard to the SPN shares. Thus, Dana's claim is without merit.

## II. SPX' Counterclaims

SPX filed counterclaims for indemnification, fraudulent inducement and promissory estoppel. Dana has moved to dismiss SPX' counterclaims under Rule 12(b)(6). (Doc. 24).

Rule 12(b)(6) motions challenge the legal sufficiency of the complaint. Allegations in the complaint must be accepted as true, *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984), while reviewing the complaint in a light most favorable to the claimant. *Westlake v. Lucas,* 537 F.2d 857 857, 858 (6th Cir. 1976).

## A. Indemnification

SPX alleges that it is entitled to indemnification from Dana for damages incurred as a result of Dana's breach of §§ 2.3, 5.1, 5.2, 8.5, and 10.1 of the agreement. (Doc. 22). SPX seeks costs incurred defending Condumex' claims and Dana's present claims.[7]

SPX argues that Dana breached § 5.1(b) of the agreement, which required Dana to conduct a pre-acquisition review of SPN and its investments and notify SPX of any matters "reasonably likely to materially and adversely affect" the business or assets of SPN. SPX also contends that Dana breached § 2.3 by failing to assume all liabilities arising out of past and present ownership of SPN and Promec shares. Further, SPX argues that Dana breached § 5.2 by failing to act reasonably in resolving Condumex' objections to the transfer of SPN.

SPX points to §§ 10.2(b)(ii) and (iv) of the agreement, where Dana must indemnify SPX for liabilities arising out of any failure of Dana to perform a covenant in the agreement. SPX argues that, under this provision, Dana must indemnify SPX for litigation costs arising out of Dana's alleged breaches of the agreement.

Dana argues that SPX may not recover such costs. According to Dana, SPX chose to assume its defense at its own expense, under § 10.3(b):

> In the case of any claim asserted by a third party against a party entitled to indemnification under this Agreement (the "Indemnified Party"), notice shall be given by the Indemnified Party to the party required to provide indemnifica-

---

7. During oral argument, SPX clarified that the damages sought consist "currently of mainly attorneys' fees associated with the defense of the action before your Court over the last several years, and the current defense of these proceedings at this point...." (Tr. 10).

tion (the "Indemnifying Party") promptly after such Indemnified Party has actual knowledge of any claim as to which indemnity may be sought, and the Indemnified Party *shall permit the Indemnifying Party* (at the expense of such Indemnifying Party) to assume the defense of any claim or any litigation resulting therefrom, *provided* that . . . . (b) the Indemnified Party may participate in such defense *at such Indemnified Party's expense* . . . . (emphasis added).

Section 10.3(b) explicitly states that if the indemnified party (here SPX) participated in its own defense, it would be at its expense. SPX assumed its own defense and it is not entitled to indemnification from Dana for the costs of defending the actions. Because SPX is not entitled to its alleged damages, Dana's motion to dismiss shall be granted.

### B. Fraudulent Inducement

■ SPX alleges that Dana represented, prior to closing of the agreement, that it would resolve Condumex' objections to the Dana/SPX transaction. SPX argues that Dana did not intend to resolve the dispute with Condumex and that SPX was harmed by Dana's misrepresentations. Because SPX has not demonstrated reasonable reliance on such representations, Dana's motion to dismiss the claim shall be granted.[8]

According to SPX, § 5.1(b) assigned Dana the responsibility of investigating Condumex' claim and informing SPX of any problems associated with the assets. SPX could reasonably rely, as alleged, on Dana's representations that Dana would resolve Condumex' objections to the proposed transaction, because § 5.1(b) placed on Dana the burden of investigating these assets.

Because SPX also made explicit representations in § 3.2 of the agreement regarding Condumex' right of first refusal, it would be unreasonable as a matter of law for SPX to rely upon any pre-closing oral statement by Dana regarding Condumex' right of first refusal. *See Cook v. Little Caesar Enter., Inc.*, 210 F.3d 653, 658 (6th Cir.2000) (under Michigan law, plaintiff may not reasonably rely on prior oral statements that directly contradict the terms of a written contract).

Based on SPX' own representation in the agreement regarding the right of first refusal, SPX cannot demonstrate that it was reasonable to rely on Dana's alleged representations. Dana's motion to dismiss shall be granted.

### C. Promissory Estoppel

As with the fraudulent inducement claim, SPX alleges that it relied on Dana's assurances that Dana would assume responsibility for resolving disputes with Condumex concerning the Promec assets. SPX argues that Dana should have expected the statements would induce it to proceed to closing and that SPX suffered damages when Dana did not fulfill its promise.

As discussed above, based on SPX' own representations and warranties under § 3.2 of the agreement regarding Condumex' right of first refusal, SPX cannot demonstrate reasonable reliance on Dana's alleged promise. *See Sprague v. General Motors Corp.*, 133 F.3d 388, 404 (6th Cir. 1998) (holding party could not reasonably rely on representation that was inconsistent with the clear and unambiguous terms of the agreement for estoppel claim). Dana's motion to dismiss this claim shall be granted.

---

**8.** Dana contends that the fraudulent inducement claim is barred by the economic loss doctrine. In *Heidtman vs. Compuware*, 2001 WL 357319, *6 (April 4, 2001), I held that the economic loss doctrine, under Michigan law, does not apply outside the UCC context. The economic loss doctrine, therefore, does not bar SPX' fraudulent inducement claim.

870

## CONCLUSION

For the foregoing reasons, it is hereby ORDERED THAT

1. SPX' motion for summary judgment on Dana's claim for indemnification be and it hereby is, granted; and

2. Dana's motion to dismiss SPX' indemnification, fraudulent inducement, and promissory estoppel claims be, and it hereby is granted.

So ordered.